AFFILIATED GOVERNMENT EM-
PLOYEES' DISTRIBUTING COMPA-
NY, a corporation, Petitioner,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 17985.

United States Court of Appeals
Ninth Circuit.

Sept. 16, 1963.

Butterworth & Smith, and Edward L. Butterworth, Los Angeles, Cal., and Helzel, Leighton & Kent, and Charles J. Leighton, Jr., Oakland, Cal., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Ralph A. Muoio, and Gilbert Andrews, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before ORR, HAMLIN and DUNIWAY, Circuit Judges.

HAMLIN, Circuit Judge.

This is a petition for review of a decision of the Tax Court (37 T.C. 909) and involves tax deficiencies determined and assessed by respondent against Affiliated Government Employees' Distributing Company (hereafter petitioner) for its taxable years ended June 30, 1956, and June 30, 1957. We have jurisdiction under sections 7482 and 7483 of the Internal Revenue Code to review the decision of the Tax Court.

Petitioner operates a group of department stores in the San Francisco Bay area for the exclusive use of its members and guests. The issue before the Tax Court was whether the membership fees paid to petitioner could be considered exempt from taxation either as contributions to capital under section 118 of the Internal Revenue Code of 1954 or as money received in exchange for stock under section 1032 of the Code. Petitioner now concedes that the fees could not be considered contributions to capital, but contends that the Tax Court erred in failing to find that the fees were paid in exchange for stock.

The facts are not in dispute and for the purpose of this opinion we will adopt the following findings of the Tax Court:

"Petitioner, a so-called nonprofit membership corporation, was organized in 1953 and exists pursuant to the General Non-Profit Corporation Law of the State of California. * * *

"Petitioner is a retail merchandising corporation which sells a broad line of consumer goods. It does not

sell to the public at large but restricts its sales and the use of its premises and facilities to its members and their guests. Members are admitted to petitioner's stores only upon presentation of a membership card and upon signing a register. However, guests are admitted when accompanied by members, and may thus make purchases without restriction.

"Prior to July 23, 1956, petitioner had two classes of membership: regular and honorary. Regular memberships were issuable to any active or retired employee of the Federal, state, or local government for an 'initiation fee' of two dollars. Such memberships were for the life of the member and were nontransferable and nonassessable. Honorary memberships required no initiation fee and were issuable to any person at the discretion of petitioner's board of directors, but not in excess of five per calendar year. On June 30, 1956, petitioner had 77,991 regular members and less than ten honorary members.

"Under petitioner's by-laws in effect prior to July 23, 1956, both regular and honorary members possessed the right to vote for its board of directors and on other corporate matters. Any membership could be revoked by two-thirds vote of the board of directors 'for cause,' and

the membership fee paid was not refundable. Any member could resign his membership and be refunded his membership fee. In the fiscal year ended June 30, 1956, a total of 52 members either resigned or had their membership revoked. All such members (including the revoked memberships, contrary to the by-laws) had their membership fees refunded.

"On and subsequent to July 23, 1956, when petitioners by-laws were revised, petitioner had three classes of membership: life, associate (Class 1 and Class 2), and honorary. Life memberships were the counterpart of the earlier regular memberships, issuable to any active or retired employee of the Federal, state, or local government for a 'consideration' of two dollars. Associate memberships, Class 1, were issuable to the widows of government employees, were for life, and cost two dollars; associate memberships, Class 2, were issuable to any person who had served at least six months in the Armed Forces of the United States, were also for life, and cost three dollars. Honorary memberships were issuable without cost to any person at the discretion of petitioner's board of directors, but not in excess of fifteen per calendar year. At the dates indicated, the number of members in each class was as follows:

|  | December 31, 1956 | June 30, 1957 |
|---|---|---|
| Life members | 90,950 | 98,107 |
| Associate members | 10,278 | 16,322 |
| Honorary members | Less than 10 | Less than 10 |

"Under the revised by-laws, only life members were entitled to vote and to attend annual or special membership meetings. In the event of petitioner's liquidation or dissolution or winding up, both life and associate members were to be entitled to a distribution pro rata of any assets

remaining to be distributed among or paid over to the members. All classifications of membership were nontransferable and nonassessable. Any membership could be revoked by a two-thirds vote of petitioner's board of directors 'for any cause deemed sufficient' by the board with-

874

out refunding any consideration paid. Any member could resign his membership and be refunded his membership fee. In the event of the death of a life or associate member, the consideration paid for his membership was payable to the member's estate upon request of his executor or administrator.

"On November 17, 1956, petitioner's by-laws were amended to provide that thereafter all refunding of membership fees, whether based on revocation, resignation, or death of the member, would be within the sole discretion of its board of directors.

"In the fiscal year ended June 30, 1957, a total of 57 members either resigned or had their membership revoked. All such members (including those whose memberships were revoked, contrary to the by-laws until November 17, 1956) had their membership fees refunded.

"Revocation of membership in petitioner during the taxable years in issue was based on action by the member contrary to the interests of petitioner. Such action included cashing bad checks, shoplifting, and in a single case using the membership privileges for the purpose of obtaining information for use against petitioner in a fair trade pricing dispute.

"Prior to issuance of memberships to eligible persons, petitioner has at all times since its incorporation filed applications for authorizing permits with the Division of Corporations of the Department of Investments of the State of California and has obtained responsive permits from the Commissioner of Corporations of the State of California authorizing the issuance and sale of such memberships as 'securities.' No memberships have been sold by petitioner except pursuant to authorizing permit of the Commissioner of Corporations.

"Eligible persons apply for membership either in person at one of petitioner's stores or by mail. Each is required to furnish proof of qualification, as well as to fill out and subscribe his or her name to an application card. During the years here in issue the applicaton for life (regular) membership contained the following information about petitioner:

"A.G.E. (Affiliated Government Employees) is a California Non-Profit corporation, not privately owned, but belongs to the membership and is managed and operated by a Board of Directors, the majority being members and Government employees.

"A.G.E. considers as eligible, any Full Time Employee of a city, county, state, military, or Federal government, or receiving retirement pay from same, members of organized reserve of U. S. Armed Forces and National Guard units. Lifetime Membership $2.00. Non-Assessable. Non-Transferable.

*　*　*　*　*　*

"A.G.E. is a buying (not selling) organization for its members. Its purpose is to obtain merchandise and services at the lowest prices obtainable, and operating on a cost plus basis to cover overhead of operations.

*　*　*　*　*　*

"The receptionist who examines applicants' identification and assists them in filling out the required application card does not instruct applicants on the rights and privileges of membership.

"Those who apply in person for life memberships (called regular memberships prior to July 23, 1956) are also requested, though not required, to execute proxies to petitioner's management. Generally, the members who applied by mail did not execute proxies. The number of members entitled to vote and the

number of proxies filed by such members were as follows at the dates indicated:

| | Number of Members Entitled to Vote | Proxies Filed |
|---|---|---|
| June 30, 1956 | 77,991 | 49,020 |
| June 30, 1957 | 98,107 | 66,833 |

"Memberships in petitioner are represented only by small cards suitable for insertion in a wallet. The main function of such cards is to identify the holder as a member in order that he may be admitted to petitioner's premises.

"All of petitioner's members, regardless of classification, are entitled to the following membership privileges:

"(a) They are privileged to enter into any of petitioner's store premises and to inspect the merchandise on display.

"(b) They are privileged to purchase merchandise at prices fixed by petitioner.

"(c) In certain cases and in respect of certain items of goods or merchandise not stocked by petitioner, members are referred to other stores or establishments where, under prior arrangements made by petitioner, its members are privileged to purchase such items at prices fixed by such stores or establishment.

"(d) They receive the A.G.E. Reporter, a pamphlet published monthly by petitioner which informs its members of petitioner's current sales events.

"In addition, any member is permitted to bring guests and guests are permitted to make purchases in petitioner's stores at the same prices that members pay.

"Petitioner has at all times classified membership fees in a capital account on its books and records and in its balance sheets.

"At no time has petitioner charged or required payment of its members in respect of renewal fees, dues, or other periodic charges, nor has petitioner received from its members any such fees, dues, or other periodic charges. Memberships in petitioner do not expire or require renewal at fixed intervals.

"At no time has petitioner paid dividends or otherwise made distributions of surplus to its members. Its Articles of Incorporation and the General Non-Profit Corporation Law of the State of California under which petitioner was formed prohibit the distribution of gains, profits, or dividends to its members and likewise prohibit the distribution of assets to its members except on dissolution or winding up.

"During the fiscal years ending June 30, 1954 through June 30, 1957, petitioner's annual, non-profits [sic] (not including such fees) after payment of income taxes were as follows:

| | June 30, 1954 | June 30, 1955 | June 30, 1956 | June 30, 1957 |
|---|---|---|---|---|
| Membership Fees | $27,341 | $73,271 | $51,382 | $ 89,186 |
| After Tax Profits | 10,213 | 50,378 | 91,259 | 171,625 |

"Petitioner's accumulated earned surplus as of June 30, 1956 was $149,968 according to its book of account. As of June 30, 1957, it was $321,597.

"An annual meeting of petitioner's members was regularly held pursuant to its by-laws. Typewritten notice of such meetings was posted on a bulletin board adjacent

to the sole entrance to each store at least fifteen days prior to the meetings. This was the only notice of the annual meetings during the taxable years in issue; however, in recent years notices have also been published in the A.G.E. Reporter which is sent to each of petitioner's members.

"During the fiscal years ending June 30, 1954 through June 30, 1958, meetings of petitioner's members entitled to vote were held on the dates and with members attending, in person or by proxy, as follows:

| | Attendance | |
| Date | By Proxy | In Person |
| May 17, 1954 | 3,291 | 4 |
| July 14, 1955 | 33,154 | Less than 25 |
| July 23, 1956 | 49,020 | Less than 25 |
| July 22, 1957 | 66,833 | Less than 25" |

During the years in question, petitioner leased the premises in which its business was carried on.[1]

The Tax Court concluded that the membership fees "were plainly of a type of receipt that is normally regarded as income" and then considered whether the fees fell within the exclusionary provisions of section 118 of the Code (relating to contributions to capital) or section 1032 (relating to a corporation's receipt of money or property in exchange for its stock). The Court held that the fees "were paid predominantly for the privilege of shopping at petitioner's stores and using its facilities" and as such were not exempt under either statute. As noted earlier, petitioner now concedes that the fees would not be considered contributions to capital, but contends that the Tax Court erred in failing to hold that they were paid in exchange for stock. For the reasons to be discussed hereafter, we agree with the Tax Court.

Section 1032 of the Internal Revenue Code of 1954 provides in pertinent part as follows:

"No gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation."

Although none of the prior revenue acts had contained a similar provision, it was clear even before the enactment of section 1032 that no gain or loss was realized by a corporation on the original sale of its stock. Difficulties arose, however, in determining whether gain or loss was realized by a corporation when it disposed of its treasury stock. To clarify the situation, section 1032 was enacted to provide for the non-recognition of gain or loss whenever a corporation receives money or property for its stock. Thus, generally speaking, Congress was only concerned with the problem of taxing gains or losses on treasury stock transactions and did not consider the problems which might arise in defining the term "stock."[2]

The term "stock" is not in fact specifically defined in the Code. Section 7701 (a) (7) does provide that the term "includes shares in an association, joint-stock company, or insurance company." It would appear therefore that Congress chose to accept the ordinary connotations of the term and merely listed certain in-

1. Additional findings were made by the Tax Court concerning the salaries paid to employees and officers of petitioner and the profit sharing trust which had been set up for them.

2. See Mertens, Law of Federal Income Taxation, Code Commentary, sec. 1032 for a detailed discussion of the legislative history and purpose of section 1032; see also Mertens, *supra*, volume 7, sec. 38.29.

terests which might not be considered "stock", as it is normally defined. For the purpose of this opinion, we shall accept the following commonly given definition of stock quoted in petitioner's brief:

> "* * * the interest or right which the owner, who is called the 'shareholder' or 'stockholder' has in the management of the corporation, and in its surplus profits, and, on a dissolution in all of its assets remaining after the payments of its debts."

The fact that memberships in petitioner may, as a matter of form, fall within the purview of this definition does not, of course, control, since in applying the income tax laws we must regard matters of substance and not mere form.[3]

Analysis of the substance of the relationship between petitioner and its members reveals to us that the fees in the instant case were not received by petitioner in exchange for its stock, but rather were received for the privilege of buying goods at a discount at petitioner's stores. Although the memberships technically had some of the indicia of stock, i. e., the right to vote for the management and the right to share in the assets upon dissolution of the corporation, these facts must be considered in the following context: a merchant-customer relationship existed between petitioner and its members; the fee paid for the privilege of purchasing at the stores was small; members did not share in profits or potential growth of the corporation during its life; membership was not assignable and terminated at death; memberships were subject to revocation for any cause deemed sufficient; refunds of the fee either upon death or resignation were solely within the discretion of the Board of Directors; and no certificate of membership other than a wallet-sized card was issued. Neither does it appear that a conscientious effort was made to inform the members of their rights to vote and share in the assets of the corporation upon liquidation. The applicants were not told at the time of their applications that they had these rights and the rights were not listed on the membership cards. Even assuming that a substantial number of the members knew of their right to vote, we submit that on the basis of the facts outlined above it could not have been reasonably foreseen that the average member would have any desire to exercise the right; it is also difficult to believe, as stated by the Tax Court, "that the remote possibility of participating in any * * * distribution upon liquidation was a factor of any consequence in relation to the payment of the comparatively small fees here in issue."

Further, as noted earlier, the Tax Court emphasized the fact that the fees "were paid predominantly for the privilege of shopping at petitioner's stores and using its facilities." Petitioner contends that motive or intent of the purchaser has no relevance to the determination whether "stock" has been purchased. If no question were raised as to the substance of the interests or rights which allegedly qualified the members as "stockholders," we would be inclined to agree with petitioner. Here, however, we feel that the issue is whether the members received any interest of substance in the corporation other than the privilege to buy at discount. In resolving this issue, we feel that the Tax Court was justified in considering all of the circumstances surrounding the purchase of memberships, including the motives or purposes of the parties to the transaction. In the instant case, we cannot see how either the management or the applicants could realistically have considered the fees paid to have been "in exchange for stock."

We do not hold here that memberships in non-stock corporations cannot fall within the purview of section 1032; nor do we hold that the absence of one or more of the normal indicia of stock considered above would preclude an exclusion under the statute. We merely hold

---

3. See Weiss v. Stearn, 265 U.S. 242, 254, 44 S.Ct. 490, 68 L.Ed. 1001 (1924).

on the facts of this case that the members received in exchange for their fees nothing of substance other than the privilege of buying goods at a discount, that their fees were thus paid solely for direct benefits to be received from petitioner [4] and as such constituted taxable income to petitioner.[5]

The judgment of the Tax Court is affirmed.

4. Cf., Community T. V. Association of Havre v. United States, 203 F.Supp. 270 (D.C.Montana 1962). See also 16 Vanderbilt Law Review 458, 465 (1963), in which the position is taken that "[T]axation of the receipts from the sale of membership certificates will not appreciably affect discount selling, whereas a non-taxable status to these receipts will be an impetus to discount sellers to utilize comparable customer selection arrangements which offer them a windfall tax benefit."

5. The record reveals that in the exercise of its discretion the Board has refunded a small number of membership fees. When such refunds are made it would seem appropriate that a tax adjustment be made. This problem, however, is not currently before us.