Bernard J. Husnik, Jr. and Joyce Husnik v. Commissioner. Donald Husnik and Beatrice Husnik v. Commissioner.
Husnik v. Commissioner
Docket Nos. 2398-67, 2399-67.
United States Tax Court
T.C. Memo 1969-34; 1969 Tax Ct. Memo LEXIS 261; 28 T.C.M. (CCH) 163; T.C.M. (RIA) 69034; February 19, 1969. Filed. Stanley J. Mosio, 303 Degree of Honor Bldg., St. Paul, Minn., for the petitioners. Charles L. Riter, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Taxable
Bernard J.
Donald Husnik
year
Husnik, Jr. and
and
Joyce Husnik
Beatrice Husnik
1962
$ 387.58
$ 275.58
1963
63.02
72.56
1964
2,651.55
2,556.61 The sole issue is whether the method of accounting with respect to a food savings plan used by the partnership, doing business as Husnik Food Center, clearly reflected its income in *262 1963 and 1964. The year 1962 is involved only because of a claimed net operating loss carryback from the taxable year 1964 and certain matters conceded by petitioners Donald Husnik and Beatrice Husnik. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners Bernard J. Husnik, Jr., and Joyce Husnik are husband and wife and had their legal residence in St. Paul, Minnesota, herein. Petitioners Donald Husnik and Beatrice Husnik are husband and wife and also had their legal residence in St. Paul, Minnesota, at the time their petition herein was filed. Petitioners Joyce Husnik and Beatrice Husnik are parties herein solely by reason of having filed joint returns with their husbands during the years in question. Subsequent references to petitioners shall be deemed to refer to petitioners Bernard J. Husnik, Jr. and Donald Husnik. During 1963 and 1964, petitioners were equal partners in a retail grocery business then known as the Husnik Food Center (and hereinafter referred to as the partnership). The partnership used an accrual method of accounting and filed Federal income tax returns on a calendar year, accrual basis. During 1963, in order to *263 meet competition, petitioners decided to sell a plan that entitled subscribers to buy food at discount prices. Subscribers in return committed themselves to pay $12 a month for 30 months and to buy at least $150 worth of food every six months. After purchasing $3,000 worth of food, the subscriber was entitled to receive a refund, either $300 worth of food or $200 in cash, as he chose. 164 The qualifying amount was later raised to $4,00 and then $5,000. Each plan was embodied in a document entitled "Warranty Bond." [1] These warranty bonds were assignable, but were not negotiable instruments. *264 In 1963, the partnership sold 4 such plans; in 1964, 115 plans; in 1965, 184 plans; in 1966, 182 plans; and in 1967, 338 plans. There were no defaults in 1963, 5 defaults in 1964, 26 in 1965, 42 in 1966, and 53 in 1967. By the end of 1967, only three subscribers had qualified for a refund, two of whom chose to take their refund in cash rather than in food. The partnership paid commissions and, in some cases, referral fees on the sale of the plans. The commissions and the referral fees averaged approximately $110 for each plan. All expenses attributable to the plans were deducted currently. The partnership customarily and promptly discounted the warranty bonds for $300 each after their execution. Most of the warranty bonds were discounted with Murphy Plan, Inc., which held back $25 for each plan as a reserve against subscribers failing to pay. The warranty bonds not discounted by Murphy Plan, Inc., were discounted by the West St. Paul Bank. The warranty bonds were endorsed with recourse to the discounting institution, which collected the monthly payments directly from the subscribers. The partnership, under its method of accounting, recognized its liability to make refunds to *265 its subscribers when the warranty bonds were executed. When a warranty bond was executed, $300 would be debited to an account entitled "Purchases of Contract Agreement," and $300 would be credited to an account entitled "Membership Pay Off," which was treated as a long-term liability account. On the partnership return of income, these debits were charged to purchases and thus entered into the determination of cost of goods sold. 165 At the time the notes were discounted, "Cash in Bank" was debited $300, and "Sales" was credited $300. On the partnership return of income, these credits were taken into income as an element of gross sales. The discount proceeds were deposited in the partnership's general bank account. Some of these proceeds were used to pay expenses petitioners considered allocable to the plans; any funds left over were periodically deposited in a savings account. This savings account was not subject to any trust in favor of the subscribers or to any other restrictions and constituted a segregation merely for the partnership's convenience. Opinion Petitioners' partnership, a retail grocery business, sold plans to certain of its customers which entitled them *266 to buy food at discount prices. In return, subscribers to the plans obligated themselves to pay $12 a month for 30 months and to purchase at least $150 worth of food every six months. After a subscriber had purchased $3,000 worth of food ($4,000 or $5,000 in later plans), he was entitled to a refund, which he could take either in the form of $300 worth of food or $200 in cash. The plans were embodied in documents entitled "warranty bonds." Although not negotiable instruments, the warranty bonds were customarily and promptly assigned to and discounted with a financial institution for $300, of which $25 was withheld in most cases as a reserve against failure of the subscriber to make payment of installments when due. The partnership endorsed the bonds to the financial institution with recourse. For both accounting and tax purposes, the partnership took the full $300 received from the financial institution into income as the proceeds of sales. It offset this amount by a corresponding deduction via a charge to purchases in computing costs of goods sold, on the assumption that it would eventually refund this amount to the subscriber when the latter had purchased the required designated *267 quantity of food. Petitioners contend that the treatment was entirely proper and advance a variety of theories to support their contention. Respondent argues that the $300 was properly accounted for as income and that the partnership is not entitled to any deduction for its potential liability to refund this amount to the subscriber. We agree with respondent. [2]
*268 At the outset, we will deal with the general assertion of petitioners that the taxability of the proceeds of the warranty bonds should be postponed until and unless the subscriber defaulted on his obligation. The foundation for this assertion is that the petitioners were only interested in selling food and keeping their customers, not in keeping the money derived from the warranty bonds. Since the plan envisaged an ultimate refund to the subscriber of th amount received, the claim is made that, irrespective of the receipt of the proceeds of discounting, the entire transaction reflects and investment or loan. Whether or not a receipt is a loan depends upon all the facts and circumstances. See New England Tank Industries, Inc., 50 T.C. 771, 777 (1968), on appeal (C.A. 1, Dec. 26, 1968). The sole aspect of the plan suggesting that the monthly payments constituted a loan is the fact that under certain circumstances the partnership would be obligated to make a refund. But the obligation to make a refund was highly contingent. It arose only if the subscriber purchased at least $150 *269 worth of food every six months, made his monthly payments when due, and purchased a minimum amount of food during the 10-year life of the plan. And even if a subscriber qualified for a refund, he would receive back, not the $360 which he would have paid, but only $300 in the form of food [3] or a cash refund limited to $200. Finally, the obligation to make a refund was geared to the purchase of several thousand dollars worth of food, not to the passage of time, as in an ordinary loan. The dominant characteristics of the refund thus suggest that it was a type of patronage refund rather than the repayment of a loan or an investment. 166 In other respects, the monthly payments have the characteristics of an item of income. The subscribers only participated in the plan to get the benefit of low food prices. They could get those prices only if they made the monthly payments. Accordingly, the payments seem clearly to have been payments for the privilege of buying food at discount prices. *270 Such eceipts are income within the meaning of section 61. [4] Accord, United Grocers, Ltd. v. United States, 308 F. 2d 634 (C.A. 9, 1962); Affiliated Government Employees' Distributing Co., 37 T.C. 909 (1962), affd. 322 F. 2d 872 (C.A. 9, 1963); cf. James Hotel Co., 39 T.C. 135 (1962), affd. 325 F. 2d 280 (C.A. 10, 1963). Petitioners argue that they did not intend to make a profit on the sale of the plans. But they can hardly deny that they hoped to make a profit from the purchases of food by their subscribers. And, in any event, a profit motive is not a necessary condition for the characterization of a receipt as taxable income. Automobile Club of New York, Inc., 32 T.C. 906, 915 (1959), affd. 304 F. 2d 781 (C.A. 2, 1962). We hold that petitioners may not defer the proceeds of the warranty bonds on any general loan or investment theory. Cf. Creasey Corporation v. Helburn, 57 F. 2d 204 (W.D. Ky. 1932); Wallace A. Moritz, 21 T.C. 622 (1954); S. B. Heininger, 47 B.T.A. 95 (1942), *271 reversed on other grounds 133 F. 2d 567 (C.A. 7, 1943), affd. 320 U.S. 467 (1943). We turn now to the proper treatment of the proceeds of the discounting of the warranty bonds. According to petitioners, these transactions also were loans. Again we disagree. The warranty bonds were endorsed with recourse to a financial institution and thereby became the financial institution's property. There is no evidence that they were treated merely as security for payments by the partnership. The partnership was only secondarily liable in the event that collections from subscribers proved insufficient. The mere fact that the partnership remained liable on its endorsement does not convert the discounting of the bonds from a sale to a loan. We hold that the discounting of the warranty bonds was a sale and not a loan and that the discount proceeds were includable in the partnership's gross income. Commissioner v. Hansen, 360 U.S. 446, 460-463 (1959); William M. Davey, 30 B.T.A. 837 (1934); cf. Federated Department Stores, Inc., 51 T.C. - (Dec. 30, 1968). The only remaining *272 question is whether the partnership properly accrued its liability to make refunds at the time the corresponding warranty bonds were executed. "Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." Section 1.461-1(a) (2), Income Tax Regs. As we have already pointed out in another context (see p. 10, supra), the partnership's liability to make a refund was highly contingent; the subscriber had to purchase a substantial amount of food, had to make his monthly payments, and had to purchase at least $150 worth of food every six months. The money received by the partnership was subject to no trust. Compare Wayne Title & Trust Co., 16 T.C. 924 (1951), affd. 195 F. 2d 401 (C.A. 3, 1952). While it is true that the partnership deposited some undetermined portion of this money in a savings account as a reserve to cover its contingent liability, the fact is that the funds *273 in that account belonged to the partnership and it was free to do with it as it pleased. All that is involved herein is an attempt to take a current deduction for a reserve to cover a future contingent liability - a course of action clearly precluded by a plethora of decisions handed down over the years. E.g., American Automobile Assn. v. United States, 367 U.S. 687 (1961); Brown v. Helvering, 291 U.S. 193 (1934); Lucas v. American Code Co., 280 U.S. 445 (1930); S. Garber, Inc., 51 T.C. - (Feb. 6, 1969). We hold that the partnership's liability to make refunds could not give rise to any deduction until such liability became fixed, an event which did not occur during the years herein in question. Accordingly, Decisions will be entered for the respondent. 167 Footnotes
1. WARRANTY BOND * * * WE SERVE YOU SAVE Family Food and Cash Savings Program Subscriber: The [partnership] agrees to deliver to subscriber for a period of 10 years: All foods, staples and frozen, of the subscriber's choice * * * at specified listed discount prices. Minimum orders of one hundred and fifty dollars ($150.00) each six (6) months. All foods are unconditionally guaranteed. Conditions Purpose: Enabling [the partnership] to purchase quality food in larger quantities at lower prices, and reflecting the savings in prices to the subscriber. To guarantee staple foods to be of top quality. To guarantee the beef to be of the government grade "Good" steer. If a different or lower grade of beef is ordered by the customer, the guarantee does not apply. To guarantee replacement of all meat if the customer is not satisfled (by reason of toughness). To guarantee to stand behind the food saving plan completely, provided that the customer fulfills his part of the food savings agreement. To guarantee notification to the customer of special purchases by the [partnership] to enable customer to save a greater amount on seasonal and special purchases. To provide insurance to the subscriber on the current food bill. In the case of the death of the breadwinner, [the partnership] agrees to insure payment of the current Husnik food bill to the subscriber family. * Food Prices subject to change without notice. Rules of Agreement 1. Customer agrees to invest in food savings program at $12.00 per month for 30 months. 2. The customer agrees to purchase food at the rate of at least $150.00 per 6 months. 3. The customer is free to arrange his own financing of food purchases in the case of cash-on-delivery (C.O.D.) orders. 4. It is understood by the customer that failure to fulfill his part of the agreement, cancels any and all obligations on the part of the [partnership]. * Service Charge It is understood subscriber will receive three hundred dollars ($300.00) food credit or two hundred dollars ($200.00) cash refund, with no charges for delivery or buying privileges after purchase of $3,000.00 in food. PROMISSORY NOTE - FOR VALUE RECEIVED, I OR WE PROMISE TO PAY $360.00 to [the partnership] or order at the place designated by the holder hereof. With interest after maturity until paid, at the maximum lawful contract rate. Payable in 30 consecutive monthly instalments of $12.00 and final instalment of $ beginning 19 . Each maker, guarantor, indorser, and surety hereof hereby waives presentment, notice of dishonor, protest and notice of protest, and diligence in bringing suit hereon, and consents that the time of payment of this indebtedness, and any or all instalments thereof may be extended from time to time without notice and without affecting their liability. If any of the said instalments, or any part thereof, are not paid when due, then the entire indebtedness then remaining unpaid or the delinquent portion thereof, shall, at the option of the holder hereof and without notice or demand, become immediately due and payable and the undersigned agrees to pay the cost of collection, including reasonable attorney's fees. Signature of subscriber: * * * * For lower prices on all foods, selection, delivery, quality guarantee, insurance (guaranteeing full payment of the current food bill in the event of the death of the family breadwinner) and all bookkeeping.↩
2. Respondent makes no claim that the partnership should have accrued the full $360 obligation for the subscriber at the time the warranty bond was executed. Cf. Mark E. Schlude. 32 T.C. 1271, 1280 (1959), reversed 283 F. 2d 234 (C.A. 8, 1960), vacated and remanded to the Court of Appeals, 367 U.S. 911 (1961), decision of this Court affirmed per curiam 296 F. 2d 721 (C.A. 8, 1961), reversed on this point pursuant to the concession of the Commissioner of Internal Revenue and affirmed in other respects, 372 U.S. 128, 133 (1963). Petitioners make no separate claim that they should not be required to include the $25 reserve retained by the financial institution. Cf. Commissioner v. Hansen, 360 U.S. 446 (1959); section 166(g), 1954 I.R.C.↩
3. The $300 in food was based on a retail value and not a lesser amount representing the cost thereof to the partnership. In the context of our decision, this differential need not be considered.↩
4. All references are to the Internal Revenue Code of 1954.↩