CONCORD VILLAGE, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2778-70.   Filed October 28, 1975.

*William Lee McLane,* for the petitioner.
*Dennis C. DeBerry,* for the respondent.

144

150

OPINION

Concord is a not-for-profit housing cooperative incorporated under Arizona law. It is organized and operated for the benefit of its members. Because Concord was formed pursuant to NHA sec. 221(d)(3), 12 U.S.C. sec. 1715 1(d)(3), it was able to obtain an FHA-insured mortgage loan at 3⅜ percent over 50 years. The FHA regulates Concord by contract (regulatory agreement) and Federal regulations. Within this regulatory framework, petitioner's board of directors, elected by Concord's members, sets policy and governs petitioner's affairs. Petitioner collects monthly carrying charges from its members which are used to fund its costs, including mortgage payments of principal and interest, taxes, operating expenses, and the creation and maintenance of certain reserve accounts required or recommended by the FHA. The taxability of these reserve accounts [3] is the first issue before us.

*Issue 1. Whether Unexpended Funds Collected by Petitioner Housing Cooperative from Its Members and Earmarked for and Accumulated in the Replacement, General Operating, and Painting Reserves are Includable in Petitioner's Gross Income*

Petitioner contends that it has neither collected nor held the unexpended funds accumulated in the reserve accounts under a

---

[3] With regard to respondent's determination of deficiency as to the includability in income of Concord's reserve accounts, the parties have contested on brief only the amounts relating to the replacement, general operating, and painting reserves. We assume that the parties have reached an agreement concerning the amounts accumulated in the other reserves, notably the vacancy, self insurance, and the undesignated funds reserves.

claim of right, and that the funds have always been restricted as to use. Relying primarily upon *Ford Dealers Advertising Fund, Inc.,* 55 T.C. 761 (1971), affd. per curiam 456 F. 2d 255 (5th Cir. 1972); *Portland Cremation Assn. v. Commissioner,* 31 F. 2d 843 (9th Cir. 1929); and *Seven-Up Co.,* 14 T.C. 965 (1950), petitioner would have us conclude that none of the funds at issue are includable in its gross income. In the alternative it argues the funds are excludable from gross income under section 118 as contributions to its capital.

Respondent's primary contention is that our decision in *Park Place, Inc.,* 57 T.C. 767 (1972), is controlling. He argues that the unexpended funds accumulated in the reserve accounts are overassessments. Because *Park Place* holds that overassessments "fall under the statutory category of patronage dividends" within the meaning of section 1388(a),[4] respondent contends that petitioner must distribute such overassessments to its members within 8½ months after the close of the taxable year in order for Concord to avoid including the reserve funds in gross income. Sec. 1382(b); sec. 1382(d).

*Park Place* involved the issue of whether overassessments (amounts collected in a taxable year from members which exceed amounts expended or refunded) which were carried on the books of the taxpayer housing cooperative to the credit of its tenant-stockholders in subsequent taxable years were taxable to it. 57 T.C. at 777-780. We specifically held that the housing cooperative had never collected any amounts, including the overassessments, under claim of right and that the reasoning of *Seven-Up Co., supra* (excluding such amounts from gross income), was applicable to both the assessments and overassessments. 57 T.C. at 779. Notwithstanding, we held the

---

[4] SEC. 1388. DEFINITIONS; SPECIAL RULES.

(a) PATRONAGE DIVIDEND.—For purposes of this subchapter, the term "patronage dividend" means an amount paid to a patron by an organization to which part I of this subchapter applies—

(1) on the basis of quantity or value of business done with or for such patron,

(2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and

(3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.

Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done with or for patrons, or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions.

overassessments to be taxable income because in enacting subchapter T Congress had specifically provided a method by which the housing cooperative could avoid taxation on overassessments, i.e., by distributing them back to the members as patronage dividends within a certain time after the close of the taxable year. 57 T.C. at 779, 780. Thus, to the extent *Park Place* controls here, the reasoning of *Seven-Up Co., supra,* and like cases, is irrelevant because in *Park Place* we held such reasoning to have been preempted by subchapter T.

At least as to a certain portion of the replacement reserve and the general operating reserve, we do not think that *Park Place* controls the resolution of the issue before us. The linchpin of our holding in *Park Place* was that the taxpayer cooperative could have paid back the overassessments to its tenant-stockholders. Had they been paid back, the overassessments would have become patronage dividends not includable in income pursuant to section 1382(b). The barest essential of a patronage dividend is that it be "an amount paid." Sec. 1388(a). Because the overassessments could have been paid back as patronage dividends, we held that they fell "under the statutory category of patronage dividends." 57 T.C. at 780. The accumulations in the replacement reserve and the general operating reserve cannot all be so categorized.

By Federal regulation, Concord cannot refund to its members any amounts from the replacement reserve or the general operating reserve until minimum monthly and annual amounts have been accumulated in each. 24 C.F.R. secs. 221.530, 221.534(a) (1966-68). Petitioner's regulatory agreement with the FHA effects these restrictions and establishes the minimum accumulations required.

No such circumstance existed in *Park Place.* In *Park Place* the overassessments could have been readily paid out to the cooperative's members. In the instant case, only after meeting reserve requirements and all obligations of the cooperative may "surplus funds" be "disbursed to the members in the form of reduced carrying charges or reduced sales prices of the dwelling accommodations, or patronage refunds." 24 C.F.R. sec. 222.534(b) (1966-68). Petitioner's bylaws and occupancy agreements with its members are in accord with the Federal regulations. Thus, to the extent that no amounts were collected and accumulated in the replacement reserve or the general

operating reserve beyond the FHA requirements, no funds were available therefrom to be distributed as patronage dividends, and to that extent the reasoning of *Park Place* is inapplicable to these two reserves. The converse is also true; that is, amounts that were collected and accumulated in the reserves beyond FHA requirements were surplus funds and were available to be distributed as patronage dividends, and to that extent the reasoning of *Park Place* applies. Moreover, merely because *Park Place* is inapplicable to certain portions of the funds does not mean that those funds are otherwise excludable from gross income. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955).

Concord's regulatory agreement with the FHA provides that an amount of $481.67 shall be allocated monthly to the replacement reserve from monthly carrying charges. The record would indicate that funds were accumulated in this reserve beyond the minimum FHA requirement. Some of the increases to the replacement reserve consisted of occupancy agreement fees which represent members' downpayments on their proprietary interests in Concord. Respondent concedes that the occupancy agreement fees are not includable in income. However, it appears that funds were collected and accumulated in the replacement reserve from monthly carrying charges which exceeded FHA minimum requirements. Under *Park Place,* these funds are includable in Concord's gross income unless otherwise specifically excludable.

The replacement reserve is a special account earmarked solely for capital expenditures. Funds in the reserve may be used only for the necessary replacement of structural and mechanical equipment such as ranges, refrigerators, plumbing facilities, washers and dryers, and disposals whose useful life has ended. The reserve funds accumulated from the monthly carrying charges are from assessments against each member pro rata according to the size and type of his dwelling unit, i.e., in proportion to his proprietary interest in Concord. The purpose of the reserve is to maintain the value of membership by providing assurance that capital equipment will be replaced upon its wearing out. These factors all indicate that the funds accumulated in the replacement reserve are contributions to

capital. *Brown Shoe Co. v. Commissioner,* 339 U.S. 583 (1950).[5] The funds, like those in *Brown Shoe Co.,* are collected under contract, that being each member's occupancy agreement with Concord. 339 U.S. at 589 n. 10.

The member receives no goods or services from Concord in consideration for his payments to the replacement reserve. The payments are made for the well being of the cooperative, and each member benefits from outlays from the reserve according to his proportionate interest in the cooperative. The member contributes to the replacement reserve in order to insure sufficient funds to replace wornout capital assets. Though one or more members may benefit directly, for example where a member's refrigerator must be replaced, the asset in the first instance belongs to the cooperative. Cf. *Moline Properties v. Commissioner,* 319 U.S. 436 (1943); compare *Affiliated Government Employees' Distributing Co.,* 37 T.C. 909 (1962), affd. 322 F. 2d 872 (9th Cir. 1963); *874 Park Avenue Corp.,* 23 B.T.A. 400 (1931). Each member's payment to the reserve is determined solely on the basis of his equity interest in the cooperative. Compare *James Hotel Co.,* 39 T.C. 135 (1962), affd. 325 F. 2d 280 (10th Cir. 1963); compare *University Country Club, Inc.,* 64 T.C. 460 (1975).

The replacement reserve is a required corollary of Concord's FHA-insured, preferred interest rate mortgage loan, and under Federal regulation and its regulatory agreement with the FHA, Concord risked, inter alia, foreclosure of the mortgage in the event minimum accumulations were not maintained in the replacement reserve. We think this circumstance, in conjunction with the other indicia of a contribution to capital discussed above, is sufficiently analogous to the facts of *Cambridge Apartment Building Corp.,* 44 B.T.A. 617 (1941) (overassessments used for early retirement of mortgage indebtedness that had been extended under a plan of reorganization after bankruptcy held to be contributions to capital), to bring the instant case within the scope of the *Cambridge* holding. Accumulations beyond the FHA minimum strengthened Concord's capital position so that if a large capital outlay in 1 year were required, the reserve could absorb the extraordinary expense.

---

[5] See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.14 (1971); Rev. Rul. 74-563, 1974-2 C.B. 38; accord, *Minnequa University Club,* T.C. Memo. 1971-305, and *Lake Petersburg Assn.,* T.C. Memo. 1974-55.

One factor has given us some concern. Upon transfer of his membership, the member has no right to any of the contributed amounts in the replacement reserve except his occupancy agreement fee which represents his downpayment on his proprietary interest in Concord. Under Concord's bylaws and each member's occupancy agreement, the transfer value of a membership is strictly limited to a set schedule which does not expressly include his contributions to the replacement reserve. However, we cannot say that the value of a member's equity in Concord has no relation to the amount he contributes to the replacement reserve. Moreover, this is only one factor to be considered, *United Grocers, Ltd. v. United States,* 308 F. 2d 634 (9th Cir. 1962), and we think on balance the funds collected and accumulated in the replacement reserve were contributions to petitioner's capital and excludable from gross income under section 118,[6] and we so hold.

We hold that the funds accumulated in the general operating reserve cannot be excluded from Concord's gross income as contributions to capital.

Concord is in the business of providing housing for the benefit of its members. Its role in managing the cooperative assets is similar to that of a caretaker. *Park Place, Inc.,* 57 T.C. at 777. Although we have some doubts about whether Concord's "economic interest in the * * * [dwelling units] is no more substantial than that of a custodian of the bare legal title," 57 T.C. at 777, it is true in the instant case as it was in *Park Place* that "the only business of petitioner (if any) during the taxable years was to manage and maintain the * * * [dwelling units] for its * * * [members]." 57 T.C. at 777. Concord's board of directors decides corporate policy within the FHA regulatory framework and approves and sets the amount of monthly carrying charges. Concord's only source of funds to meet current expenses is from the monthly carrying charges collected from its members.[7]

In order to insure Concord's secure operating position, the FHA requires the establishment and maintenance of the general operating reserve; failure to do so may result in mortgage foreclosure. However, use of these funds is limited only by the occasions on when they may be spent, that is, during periods of

[6] Accord, Rev. Rul. 75-371, 1975-35 I.R.B. 7.
[7] Minor amounts of income are derived from interest on Government obligations and savings accounts and from soda-vending machines.

financial stress. Their use is not intended for nor in any way restricted to capital expenditures, though the funds could be so spent. We think the reasoning of *Paducah & Illinois Railroad Co.*, 2 B.T.A. 1001 (1925), forcefully applies to the instant case.

In *Paducah* a number of railroad companies had formed the taxpayer to construct and maintain bridge facilities for the companies' rail traffic across the Ohio River. The taxpayer's income was derived from tolls and charges assessed according to use of the bridge facilities. If the tolls were insufficient to cover operating costs, taxes, interest, and principal on its bonded indebtedness, the companies would pay the deficit to the taxpayer by additional assessments according to use. We said, 2 B.T.A. at 1006-1007:

> From the beginning, the funds so contributed by the railroad companies were earmarked partly for the ordinary expenses of the taxpayer and partly for its capital requirements. In so far as the contributions were used or to be used for ordinary expenses, interest, taxes, and dividends, there can be no question that the railroad companies were making payments for services rendered by the taxpayer, which constituted expenses to themselves and income to the taxpayer. * * *

Likewise in the instant case, funds contributed to the general operating reserve were payments to Concord to be used for ordinary expenses incurred in the course of rendering its services to its members. The fact that the payments were made in advance of any expenses incurred, or that expenses entailing the use of the reserve funds might never be incurred, does not in our opinion change the character of those funds as part of the price of Concord's services. Cf. *Teleservice Co. of Wyoming Valley*, 27 T. C. 722 (1957), affd. 254 F. 2d 105 (3d Cir. 1958).

Although accounting practices are not determinative, *United Grocers, Ltd. v. United States*, 308 F. 2d at 641, the name by which parties choose to characterize an account is important. *Terminal Realty Corp.*, 32 B.T.A. 623, 632 (1935); cf. *Clay Sewer Pipe Association, Inc.*, 1 T.C. 529, 537 (1943), affd. 139 F. 2d 130 (3d Cir. 1943). Here, form comports with substance; the contributions to the general operating reserve are not contributions to Concord's capital.

Funds accumulated in the general operating reserve beyond the FHA minimum requirements are eligible for distribution as patronage dividends. Therefore, they are taxable under the rationale of *Park Place, Inc., supra.* Moreover, we think that the

funds accumulated in the general operating reserve to satisfy the minimum FHA requirements are also taxable income to Concord. Sec. 61(a); *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426 (1955).

Concord was neither a mere conduit nor a trustee of these funds. We cannot find, as we did in *Ford Dealers Advertising Fund, Inc.,* 55 T.C. 761 (1971), that no benefit, profit, or gain accrues to petitioner from the reserve or that there exists a trust relationship between Concord and its members as regards the funds in the reserve.

Members have no right to the funds in the general operating reserve, except in their shareholder capacity which is itself restricted by contract, i.e., each member's occupancy agreement. Concord, through its board of directors, retains control over the reserve. The board decides upon the disposition of the funds, which may be used wherever needed to pay for Concord's operational services to members in a tight financial situation. Concord may also use the funds to repurchase memberships for its own account from departing members. Except excess accumulations which may be returned as patronage dividends in the board's discretion, no funds from the reserve can be paid back to members. The transfer value of a membership does not have any relation to a member's contributions to the general operating reserve. Unlike the replacement reserve, expenditures from which maintain the value of a membership and are foreseeable, the general operating reserve funds may possibly never be spent. Concord's right to use the funds is limited only by circumstances of financial stress and by approval of the FHA, should Concord desire to spend more than 20 percent of the reserve in any accrual period. See *Angelus Funeral Home,* 47 T.C. 391, 398 (1967), affd. 407 F. 2d 210 (9th Cir. 1969). Compare *Growers Credit Corp.,* 33 T.C. 981, 997 (1960), where we allowed the taxpayer cooperative to exclude similar funds from income because under the circumstances of that case we found the taxpayer to have been a mere custodian of the funds.[8]

We find Concord's right to control the general operating reserve funds not subject to the restrictions normally placed on a trustee. Beyond the corporate-shareholder relationship, the record indicates the existence of only a contractual relationship

---

[8] Compare also Rev. Rul. 75-370, 1975-35 I.R.B. 6.

between Concord and its members governing Concord's use of the general operating reserve. *Portland Cremation Assn. v. Commissioner,* 31 F. 2d 843 (9th Cir. 1929), relied on by petitioner, is distinguishable in that the record in the instant case is devoid of evidence from which we might infer any intent to create a trust relationship. All amounts accumulated in the general operating reserve are includable in petitioner's gross income.

As to the painting reserve, we think *Park Place, Inc., supra,* controls. The FHA suggests the creation and maintenance of this reserve, but does not require it. Concord's board of directors established the reserve, and it exists at the board's directive. Concord's board determines the amounts to be accumulated in the painting reserve. There is no prohibition against paying back to members amounts that are allocated to the painting reserve and not expended.

Petitioner argues that the accumulations in the painting reserve are not overassessments because the reserve is a necessary expense of operation. We can see no difference between this reserve fund and the overassessments in *Park Place* which were carried from year to year on the cooperative's books to the credit of the cooperative's tenant stockholders. 57 T.C. at 779, 780. We defined "overassessments" in *Park Place* as "the excess of the amount collected in a taxable year over the amount refunded or *actually expended* in that year." (57 T.C. at 779; emphasis supplied.) Funds accumulated in the painting reserve were not actually expended or refunded in any of the taxable years before us.

Neither are the amounts accumulated in the painting reserve contributions to capital. Painting is a repair and maintenance expense of operation, not a capital expenditure. *Luce Furniture Co.,* 9 B.T.A. 1413 (1928); *E. L. Potter,* 20 B.T.A. 252 (1930); see *William K. Coors,* 60 T.C. 368, 403 (1973), affd. 519 F. 2d 1280 (10th Cir. 1975). Members' payments accumulated in the painting reserve were part of the price of Concord's services. In this regard, our reasons for holding the funds in the general operating reserve not to be contributions to capital are equally applicable here. Such funds are includable in Concord's gross income.

*Issue 2. Whether Amounts that Petitioner's Members Receive
from the Sale of Their Memberships Which Are in Excess
of the FHA-Established Transfer Value of the Memberships
and Which Are Forfeited to Concord Are Includable
in Petitioner's Gross Income*

When a member of Concord sells his membership, he must forfeit to Concord any part of the selling price which exceeds the "transfer value" of his membership as defined by Concord's bylaws pursuant to FHA specification. Concord received from such forfeitures the amounts of $5,546, $2,500, and $2,500 in taxable years 1966, 1967, and 1968, respectively.[9]

Petitioner argues that such amounts are not includable in its gross income by virtue of either section 1032(a)[10] or section 118.

Petitioner misconstrues section 1032(a). This section applies only to transactions in which a corporation is disposing of its own shares. Sec. 1.1032-1(a), Income Tax Regs. In the instant case it is not Concord, but Concord's members who are exchanging memberships for "money or other property."[11] Thus, section 1032(a) provides no relief from taxation to Concord. See *Cardinal Corp.*, 52 T.C. 119, 126 (1969).

Neither can we hold the forfeitures to be contributions to capital. We think *General American Investors Co.*, 19 T.C. 581 (1952), affd. 211 F. 2d 522 (2d Cir. 1954), affd. 348 U.S. 434 (1955), is on point here.

In *General American Investors,* taxpayer corporation had excluded from its gross income amounts forfeited to it as insider profits under section 16(b) of the Securities and Exchange Act of 1934, 48 Stat. 881, 896, and section 30(f) of the Investment Company Act of 1940, 54 Stat. 789, 837. It was held that such

---

[9] To the extent that respondent bears the burden of proving the taxability of these amounts to Concord, we find that he has carried the burden. Rule 142(a), Tax Court Rules of Practice and Procedure. In his statutory notices of deficiency for taxable years 1966 and 1968 respondent did not determine the respective amounts of $5,546 and $2,500, allocated to "paid in reserve" on petitioner's books, to be includable in Concord's gross income. The parties stipulated that "respondent asserts that the contingency reserve adjustment in the statutory notices of deficiency should be increased for the years 1966 and 1968" by those respective amounts. Petitioner did not argue that respondent bears the burden of proof as to these amounts.

[10] SEC. 1032. EXCHANGE OF STOCK FOR PROPERTY.

(a) NONRECOGNITION OF GAIN OR LOSS.—No gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation.

[11] Concord's memberships are its "stock" for purposes of sec. 1032(a). *Affiliated Government Employees' Distrib. Co. v. Commissioner*, 322 F. 2d 872 (9th Cir. 1963).

forfeitures constituted income to the taxpayer under section 22(a), I.R.C. 1939, the predecessor of section 61(a).

The forfeiture to Concord of the difference between the selling price of a membership and its transfer value is designed to prevent windfall profits from accruing to Concord's departing members. Such windfalls could be occasioned by the preferential 3⅜-percent interest rate on Concord's mortgage loan. The forfeitures received by Concord, like those received by the taxpayer in *General American Investors,* may be used for any purpose. In affirming the Second Circuit which had affirmed us, the United States Supreme Court held in *General American Investors* as follows (348 U.S. at 436):

The reasons which dictated that result [the result in *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426 (1955)] are equally compelling here. We see no significant difference in the nature of these receipts which might make that ruling inapplicable. As in *Glenshaw,* the taxpayer realized the money in question free of any restrictions as to use. The payments in controversy were neither capital contributions nor gifts. * * *

The forfeitures to petitioner were clearly gain to it. We hold that they are includable in petitioner's gross income. Sec. 61(a).

*Decision will be entered under Rule 155.*