DIALCAB TAXI OWNERS GUILD ASSOCIATION, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dialcab Taxi Owners Guild Asso. v. Commissioner
Docket No. 714-78.
United States Tax Court
T.C. Memo 1981-410; 1981 Tax Ct. Memo LEXIS 326; 42 T.C.M. (CCH) 590; T.C.M. (RIA) 81410; August 10, 1981; As Amended August 18, 1981 Charles M. Levy, for the petitioner. Michael A. DeLuca and Michael Shaff, for the respondent. TANNENWALD
MEMORANDUM OPINION TANNENWALD, Chief Judge: Respondent determined deficiencies in petitioner's Federal income taxes of $ 29,115.96, $ 69,889.53, and $ 111,658.93 for the taxable years 1973, 1974, and 1975. The issues presented are whether petitioner is an organization described in section 501(c)(12)[1] and, if not, whether initiation fees and weekly dues received by petitioner from its members are excludable from petitioner's gross income by sections 118 or 1032. This case was submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and related exhibits are incorporated by this reference. Petitioner is a New York nonprofit corporation with its principal place of business in Brooklyn, N.Y. Its members *328 each own, directly or indirectly, taxicabs licensed by New York City. According to its certificate of incorporation and its by-laws, petitioner was created to provide radio dispatching service to its members, to advertise the availability of taxicab services to the public, to promote the safety of its members, and generally to "foster and promote the interests of those individuals who are engaged in business as licensed medallion taxicab owners in the City of New York." Petitioner owns and operates a two-way radio station used to dispatch its member cab owners. Petitioner installs in each member's cab a two-way radio and related equipment. The radio and equipment remain petitioner's property. Petitioner employed dispatchers at its transmitting station 24 hours per day, 7 days per week. The equipment placed in each cab includes a hidden alarm system which members may activate when they believe they are in danger. In addition, petitioner encourages its members to report suspicious or criminal behavior seen while on duty to the dispatcher so that information can be relayed to the police. Petitioner regularly purchases fare vouchers from its members. These fare vouchers represent *329 receivables from charge account customers for services performed by petitioner's members. Petitioner purchases these vouchers at a discount of between 10 and 15 percent from face value and then collects the vouchers from the charge customers. Once petitioner purchases a fare voucher, it bears the risk of nonpayment. Members of petitioner are not obligated to use petitioner's services. However, petitioner provides its services exclusively to its members. Petitioner's membership is limited to licensed taxicab owners of good moral character. If an individual qualifies for membership, he pays an "initiation fee" ranging from $ 750 to $ 1,500 during the years in issue, an amount ranging from $ 3,000 to $ 6,000 for "radio rights," and weekly dues which have varied between $ 20 and $ 30. While the initiation fees and weekly dues are nonrefundable, the "radio rights" of an outgoing member will be sold if possible by petitioner, and the proceeds from such sale will be paid over to the outgoing member. During the years in issue, no member lost money on the sale of his radio rights. Petitioner's gross income during the years in issue was $ 363,661 for 1973, $ 483,756 for 1974, and *330 $ 655,646 for 1975. Of these amounts, $ 196,368, $ 275,235, and $ 382,528 represented dues, initiation fees, and payments for radio rights received by petitioner from members in each of the aforesaid years, respectively. During that same period, petitioner's deductions from gross income totaled $ 289,461.06 for 1973, $ 324,609.65 for 1974, and $ 394,897.93 for 1975. Petitioner did not distribute any of its net income; however, petitioner did excuse its members from one week's dues for the week of Christmas 1975. Petitioner's directors were uncompensated, as were petitioner's officers. However, petitioner's office manager received a salary. Petitioner makes two basic contentions: (1) that it is a mutual or cooperative telephone company or like organization, and therefore exempt from tax under section 501(c)(12), and (2) that the amounts it received from its members in the form of intitiation fees, weekly dues, and payments for radio rights are excludable from petitioner's gross income as contributions to petitioner's capital, see section 118, or as in exchange for petitioner's stock, see section 1032. Because it will facilitate our disposition of the instant case, we deal first *331 with petitioner's second contention. Petitioner's contention that section 1032 is applicable is without merit. Section 1032 provides that "no gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation." Petitioner is not lawfully entitled to issue stock. N.Y. Not-For-Profit Corp. Law, see. 501 (McKinney 1970). Although petitioner may issue certificates documenting capital contributions (within the meaning of New York state law), see N.Y. Not-For-Profit Corp. Law, supra, sec. 502 et seq., it has not chosen to do so. Thus, there is nothing which even purports to be corporate stock, a usual ingredient to a section 1032 exchange. Conceivably, some portion of the amounts involved may have represented payment for some proprietary right such as the right to share in the assets of petitioner in the event of dissolution. [2] But on the record before us, we are unable to determine now much, if any, represented payment for any such rights. It was petitioner's burden to prove the amounts which should be properly so allocated. In view of the foregoing, section 1032 is clearly inapplicable *332 herein. As far as section 118 is concerned, whatever may be the contours delineated by that section, its legislative history, its common law ancestors, or its descendants (see generally State Farm Road Corp. v. Commissioner, 65 T.C. 217 (1975)), we are satisfied that it has no bearing herein. The record is clear that the various amounts paid to petitioner were paid to insure the direct and current receipt of petitioner's services -- petitioner's members were in effect its customers. They stand in sharp contrast to the kind of benefits involved in Federated Department Stores, Inc. v. Commissioner, 51 T.C. 500, 518-520 (1968), affd. 426 F.2d 417 (6th Cir. 1970). Cf. B. Forman Co. v. Commissioner, 54 T.C. 912, 923-926 (1970), *333 affd. on this issue 453 F.2d 1144 (2d Cir. 1972). See University Country Club, Inc. v. Commissioner, 64 T.C. 460, 471-474 (1975). Under the circumstances herein, they cannot be considered capital contributions. Washington Athletic Club v. United States, 614 F.2d 670 (9th Cir. 1980); Affiliated Government Employees' Distributing Co. v. Commissioner, 37 T.C. 909 (1962), affd. 322 F.2d 872 (9th Cir. 1963). In sum, we hold that the amounts involved constituted income taxable to petitioner unless it is entitled to exemption under section 501(c)(12), and it is to that issue that we now turn our attention. Petitioner argues that it is an organization described in section 501(c)(12). That section includes -- Benevolent life insurance associations of a purely local character, mutual ditch or irrigation companies, mutual or cooperative telephone companies, or like organizations; but only if 85 percent or more of the income consists of amounts collected from members for the sole purpose of meeting losses and expenses. *334 Petitioner cites Rev. Rul. 57-420, 1957-2 C.B. 308, and Peninsula Light Co. v. United States, 552 F.2d 878 (9th Cir. 1977), for the proposition that it is a cooperative telephone company, or like organization. We do not reach this issue, however, because we hold that petitioner is disqualified under the 85-percent test of section 501(c)(12). [3]
Although the parties have stipulated that 99 percent of petitioner's gross income was received from its members, there is no stipulation concerning the amount of income collected "for the sole purpose of meeting losses and expenses." The burden of proof is on petitioner. Rule 142(a). Section 501(c)(12) quite plainly requires that at least 85 percent of a qualifying organization's gross income be collected to cover expenses and losses. [4] During the years in issue, petitioner's ratios of deductions *335 (including depreciation), which respondent has not disputed, to gross income were 0.80 for 1973, 0.67 for 1974, and 0.60 for 1975. Petitioner thus was acquiring a substantial net worth far in excess of its reasonably anticipated needs, a net worth exceeding $ 700,000 at the end of 1975. Petitioner argues that its retained profits constitute no more than a reserve account to cover future expenses and losses. To be sure, amounts in such an account should be treated as collected to meet losses and expenses, see section 1.501(c)(12)-1, Income Tax Regs., but it is petitioner's burden to prove that the reserve account will be so used. The record herein is woefully short of such proof. Petitioner's only proffered justification *336 for its substantial retained earnings was its factoring activity. Although it is true that petitioner paid out more than $ 1,000,000 per year to its members as part of its factoring activity, it collected a greater sum than it disbursed once its charge customers paid their bills. After the first few months of its existence (and petitioner's first taxable year is not before this Court), petitioner's cash flow would have been sufficient to cover its factoring activity -- in any event, petitioner has failed to prove the contrary. [5]
Petitioner has demonstrated no other need for a substantial reserve account. Petitioner had no major capital expenditures, and the depreciation deduction itself constituted in effect a reserve account for the replacement of tangible assets. On the record before us, we cannot find that petitioner has carried its burden of proving that 85 percent of its income in any taxable year in dispute was collected solely to cover losses and expenses, and we therefore hold that petitioner was not, *337 during the years in issue, and organization described in section 501(c)(12). Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. Unless otherwise indicated, any reference to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.↩
2. Because petitioner's certificate of incorporation does not prescribe the distributive rights of its members, a voluntary dissolution of petitioner would result in its net assets being distributed as specified in the plan of dissolution adopted at the time of dissolution by petitioner's board of directors and ratified by its members. See N.Y. Not-For-Profit Corp. Law, sec. 1001 et seq.↩ (McKinney 1970).
3. We do note, however, that, in Peninsula Light Co. v. United States, 552 F.2d 878 (9th Cir. 1977), the Court of Appeals carefully limited its opinion to the "specific facts of this case," see 552 F.2d at 882↩, so petitioner's reliance thereon is, in any event, tenuous.
4. Respondent suggests that section 501(c)(12) can only be satisfied it at least 85 percent of gross income is received from members and 100 percent of the amount is collected to cover losses and expenses. Because we hold that petitioner has failed to prove that even 85 percent of its income was collected to cover losses and expenses, we do not decide whether respondent's interpretation of section 501(c)(12)↩ is correct.
5. In addition, it is far from clear that funds needed for the factoring activity are properly characterized as "meeting losses and expenses." Section 501(c)(12)↩.