**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 96-60679.

G.M. TRADING CORPORATION, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Sept. 12, 1997.

Appeal from the Decision of the United States Tax Court.

Before JOLLY, SMITH and DENNIS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

G.M. Trading Corporation ("G.M.") surrendered $600,000 worth of Mexican national debt to the Mexican government and received approximately 1.7 billion pesos restricted to the construction of a plant in Mexico. The Tax Court found that G.M. recognized $410,000 of gain. Concluding, to the contrary, that the pesos received in exchange for the debt extinguishment were worth $600,000, and the balance of the value received constituted a nontaxable contribution to capital, we reverse and render judgment for the taxpayer.

I.

A.

In the late 1980's, the Mexican government maintained a policy designed to encourage foreign investment and to decrease the outstanding balance of its foreign-currency-denominated debt (the "Program"). The Program had many different incarnations; we need consider only one.

Under "Mecanismo No. 4," a foreign corporation would purchase foreign-currency denominated debt from a bank and surrender that debt to the Mexican government. For its part, the Mexican government would grant a certain number of pesos to a new Mexican subsidiary of the foreign corporation. Usually, these pesos would be restricted to uses benefiting the Mexican economy. The stock that the foreign corporation received would be subject to restrictions on transfer and dividends.

The number of pesos granted was determined by a set formula. Mexico paid the face amount of the debt retired, discounted by 0% to 25%. Because Mexico was not making interest or principal payments at the time, the market discount on the debt always was higher than 25%.

The particular amount of the discount was calculated "upon the perceived benefit of each proposed investment to the Mexican economy." Specifically, the Mexican government desired to encourage foreign investment, high-technology businesses, and high export production. A 100% foreign investor forming a high-technology business exporting at least 80% of its production would receive a 5% discount.

B.

G.M.[1] is a Texas corporation engaged in the processing of sheep skins. In 1987, G.M. was interested in locating a plant in Acuña, México, and contacted the Mexican government about participating in the Program. The Mexican government approved

---

[1]"G.M." stands for General Merchandise. It not related to General Motors Corporation.

G.M.'s proposal and, in November 1987, the following transaction (the "Transaction") occurred:

1) For $600,000, G.M. purchased U.S.-dollar-denominated Mexican debt bearing a face value of $1,200,000 from a Dutch bank. The fair market value of this debt at the time was $600,000. G.M. also incurred fees and costs totaling $34,000.

2) G.M. caused that debt to be surrendered to the Mexican government.

3) The Mexican government tendered to Procesos G.M. de México, S.A. de C.V. ("Procesos"), a subsidiary of G.M., 1,736,694,000 pesos restricted to the construction of a sheep skin processing plant in Acuña. The amount of 1,736,694,000 unrestricted pesos would have had a fair market value of $1,044,000.[2]

These pesos were highly restricted. They could be used only

---

[2] G.M. urges that we apply the step transaction doctrine and recharacterize the Transaction. Specifically, G.M. urges that we treat G.M. as having contributed $600,000 to Procesos and Procesos having purchased the restricted pesos from the Mexican government. We must reject this suggestion.

> The step transaction doctrine allows the disregard of steps that have no substance. *See Esmark, Inc. v. Commissioner,* 90 T.C. 171, 195, 1988 WL 5887 (1988) (stating that the doctrine mandates ignoring "meaningless or unnecessary steps"), *aff'd mem.,* 886 F.2d 1318 (7th Cir.1989) (table). It does not allow the invention of steps that did not happen. *See Grove v. Commissioner,* 490 F.2d 241, 247-48 (2d Cir.1973) (quoting *Sheppard v. United States,* 176 Ct.Cl. 244, 361 F.2d 972, 978 (1966) (per curiam)); *Esmark,* 90 T.C. at 196 ("This recharacterization does not simply combine steps; it invents new ones. Courts have refused to apply the step-transaction doctrine in this manner.").

> The record unambiguously shows that G.M. paid $600,000 to the bank, and Procesos never had possession of that money. It is ironic that G.M. argues that the substance of the Transaction was that Procesos made an exchange with the Mexican government, when Procesos would not have existed absent the transaction.

for the purchase of land and the construction and outfitting of an industrial plant in Acuña.  The Mexican government controlled the pesos and paid them to vendors directly.

The identity of those vendors also was restricted greatly. For example, Procesos had to employ Mexican companies and use Mexican goods and services in constructing the plant.  Procesos could purchase land only from persons willing to reinvest the sale proceeds in México.  Until use, the pesos bore interest at the rate for treasury certificates.  The interest, unlike the principal, was not restricted.

G.M.'s stock in Procesos was subject to additional restrictions.  G.M. could not transfer the stock to a non-Mexican entity until 1998.  The stock could not be redeemed on a basis more favorable than the amortization of the debt surrendered.  With a minor exception, the stock could not pay guaranteed dividends "irrespective of earnings and profits."  Finally, the stock could not be converted into stock that did not contain these restrictions.

## C.

G.M. reported no taxable gain on the Transaction.  The Commissioner of Internal Revenue (the "Commissioner") determined that G.M. recognized a gain of $601,745[3] and issued a notice of deficiency for that amount.  G.M. petitioned the Tax Court for a redetermination.

---

[3]The Commissioner determined that G.M. realized $1,200,000 from the Transaction, paid $540,000, and incurred costs of $58,255. It is difficult to understand how the Commissioner arrived at these numbers.

Before the court, the Commissioner argued that G.M.'s gain was $1,044,000 minus $634,000, or $410,000. G.M. continued to argue that it had no taxable gain. The Tax Court adopted the Commissioner's position. *See G.M. Trading Corp. v. Commissioner,* 103 T.C. 59, 1994 WL 386151 (1994). The court granted rehearing and then affirmed its earlier opinion. *See G.M. Trading Corp. v. Commissioner,* 106 T.C. 257, 1996 WL 182279 (1996) (*G.M. Trading II*).

## II.

### A.

We review the Tax Court's determinations of law *de novo* and its factual findings for clear error. *See Bolding v. Commissioner,* 117 F.3d 270, 273 (5th Cir.1997). "A finding is "clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Findings of fact influenced by an erroneous view of the law are entitled to no deference. *See United States v. Capote-Capote,* 946 F.2d 1100, 1102 (5th Cir.1991).

The Commissioner has promulgated Rev. Rul. 87-124, 1987-2 C.B. 205, to govern debt-equity swaps with foreign governments. According to this ruling, the taxpayer should pay gain on the value of the restricted foreign currency received minus the amount paid for the debt and any collateral expenses. The fair market value of the restricted foreign currency is determined "by taking into account all the facts and circumstances of the exchange."

This ruling implicitly holds that no portion of the debt-equity swap qualifies as a nontaxable contribution to capital. The Tax Court arguably followed this ruling, although it determined that the restrictions on the foreign currency did not lower its value. As we will explain, the Tax Court's ruling and Rev. Rul. 87-124 are erroneous as a matter of law.

B.

Section 118(a) of the Internal Revenue Code states, "In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer." 26 U.S.C. § 118(a). This exclusion is not limited to contributions by a shareholder; it "applies to the value of land or other property contributed to a corporation by a governmental unit or by a civic group for the purpose of inducing the corporation to locate its business in a particular community...." 26 C.F.R. § 1.118-1 (1996).

The test for determining whether a particular payment is a contribution to capital is "the intent or motive of the transferor." *United States v. Chicago, Burlington & Quincy R.R.,* 412 U.S. 401, 411, 93 S.Ct. 2169, 2175, 37 L.Ed.2d 30 (1973); *accord Deason v. Commissioner,* 590 F.2d 1377, 1378 (5th Cir.1979). Specifically, the contribution (1) must become a part of the recipient's capital structure; (2) may not be compensation for a "specific, quantifiable service"; (3) must be bargained for; (4) must result in a benefit to the recipient; and (5) ordinarily will contribute to the production of additional income. *Chicago, Burlington & Quincy R.R.,* 412 U.S. at 413, 93 S.Ct. at 2176.

The second prong is the only one contested by the

Commissioner. Part of the payment by the Mexican government was in exchange for extinguishing a portion of Mexico's debt. This portion was compensation for a specific, quantifiable service and does not qualify as a nontaxable contribution to capital.

Another part of the payment was intended to induce G.M. to invest in the Mexican economy. This is not a specific, quantifiable service. A payment to induce investment is the quintessential nontaxable contribution to capital. *See Brown Shoe Co. v. Commissioner,* 339 U.S. 583, 591, 70 S.Ct. 820, 824, 94 L.Ed. 1081 (1950).

At first glance, the obvious solution is to bifurcate this payment into its constituent parts and tax G.M. on the value of the restricted pesos received in exchange for extinguishing the debt and exclude the balance from taxation. This solution, however, assumes that § 118(a) permits such bifurcation.

C.

1.

We are faced with three possible interpretations of § 118(a). G.M. argues that § 118(a) permits bifurcation. The Commissioner and the Tax Court, on the other hand, argue that it does not, albeit on different theories.

The Commissioner argues that the "dominant purpose" of the entire transaction governs. If inducement to invest is the dominant purpose, the entire payment, including portions paid for services, constitutes a nontaxable contribution to capital. If payment for services is the dominant purpose, the entire payment is taxable.

The Tax Court, on the other hand, adopted an extreme "taint" theory. It held that § 118(a) was inapplicable unless the "only benefit" received by the government was an indirect civil benefit. *G.M. Trading II,* 106 T.C. at 266 (quoting *Federated Dep't Stores, Inc. v. Commissioner,* 51 T.C. 500, 519, 1968 WL 1414 (1968), *aff'd,* 426 F.2d 417 (6th Cir.1970)). In other words, the Tax Court held that any amount of direct services taints the entire transaction and makes § 118(a) inapplicable.

2.

As always, we begin our investigation by examining the plain language of the statute. *See Ojo v. INS,* 106 F.3d 680, 681 (5th Cir.1997). Absent indications to the contrary, we assume that the words in a statute carry their ordinary meaning. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 388, 113 S.Ct. 1489, 1494-95, 123 L.Ed.2d 74 (1993). Where possible, every word in a statute should be given meaning. *See Nalle v. Commissioner,* 997 F.2d 1134, 1139 (5th Cir.1993). Section 118(a) states that "gross income does not include any contribution to the capital of the taxpayer."

We find the use of the word "any" to be significant. *See Rekant v. Desser,* 425 F.2d 872, 880 n. 15 (5th Cir.1970) (relying on the broad scope of the plain meaning of "any"). According to the plain terms of the statute, anything that qualifies as a contribution to capital is nontaxable. The statute mandates bifurcation by requiring that *any,* rather than *some,* contributions to capital be excluded from income.

The statute does not direct us to look at a multi-part payment

as a whole.  Both the Commissioner's and the Tax Court's theories require us to do so.  As a result, both theories require the imposition of taxation on contributions to capital.  That is plainly inconsistent with the statute.

3.

a.

This interpretation of § 118(a) is well supported by precedent.  In *Concord Village, Inc. v. Commissioner,* 65 T.C. 142, 1975 WL 3188 (1975), for example, the Tax Court bifurcated monthly carrying fees paid by tenants to a cooperative.  The court held that the portion of those fees that the cooperative placed in a capital reserve fund was exempt under § 118(a).[4]

The Commissioner counters that these multi-part payments "consisted of specific and ascertainable dollar amounts that were paid solely for a purpose within the scope of Section 118."  This was not mentioned as a requirement in any of these cases and, in fact, is not true.  In each case, the transferor made one, non-separated payment;  it was the cooperative that divided it.

Furthermore, we note that the Commissioner does not even attempt to distinguish *Bear Valley Mut. Water Co. v. Riddell,* 283 F.Supp. 949 (C.D.Cal.1968), *aff'd,* 427 F.2d 713 (9th Cir.1970) (per curiam).  In that case, shareholders paid periodic assessments and received a free supply of water.  These funds were mixed in with

---

[4]*See Concord Village,* 65 T.C. at 156;  *accord Cambridge Apartment Bldg. Corp. v. Commissioner,* 44 B.T.A. 617, 618-19 (1941) (reaching the same conclusion under almost identical facts, except that the excluded money was used to retire the cooperative's debt); *Appeal of Paducah & Ill. R.R.,* 2 B.T.A. 1001, 1006-07 (1925) (reaching the same result with a corporation owned by two railroads).

general funds, which were used to pay both current and capital expenses. Despite the inherent difficulty in allocation, the court ordered the bifurcation of the payments, opting to devise a formula for determining the proper division. *See id.* at 960; *accord San Antonio Water Co. v. Riddell,* 285 F.Supp. 297, 311 (C.D.Cal.1968), *aff'd,* 427 F.2d 713 (9th Cir.1970) (per curiam).

b.

By contrast, we have not found any support for either the Commissioner's or the Tax Court's position. The precedent cited by the Commissioner in support of the "dominant purpose" theory does not do so.

In *United Grocers, Ltd. v. United States,* 308 F.2d 634 (9th Cir.1962), members of a buying cooperative were required to pay annual dues, which the cooperative claimed were contributions to capital. The court disagreed, noting that the dominant purpose for paying dues was to qualify for the low-price goods and services supplied by the cooperative. *See id.* at 639. The court held, as a matter of fact, that there was no investment motive or desire to benefit the community. *See id.* at 640. Without such a motive, no part of the payment qualified as a nontaxable contribution to capital. Consequently, the court had no occasion to consider the possibility of bifurcation.

Similarly, in *Putoma Corp. v. Commissioner,* 601 F.2d 734, 751 (5th Cir.1979), we faced a single-part payment, none of which was for a specific service, and thus we had no opportunity to consider the merits of bifurcation. The only case cited by the Tax Court, *Federated Dep't Stores, Inc. v. Commissioner,* 51 T.C. 500, 1968 WL

1414 (1968), *aff'd,* 426 F.2d 417 (6th Cir.1970), suffers the same infirmity.[5]

4.

Finally, we note that the Commissioner's and Tax Court's proposals are bad policy. According to the Tax Court, if a company receives $10 million to locate an office supply factory in Houston and agrees to supply city employees with pencils, the entire $10 million is taxable. That result would force persons to refrain from economically-efficient transactions.

The Commissioner's rule would be even worse. Under the "dominant purpose" test, if Houston paid the same company $400,000, of which $199,999 was for office supplies and $200,001 was to induce investment, the entire amount would be exempt under § 118(a). This would allow for structuring opportunities that would result in substantial underpayment of taxes.

III.

A.

The Tax Court did not attempt to determine what portion of the restricted pesos was in exchange for debt extinguishment and what portion was for inducing investment. Under other circumstances, we might remand to the Tax Court to make that factual determination. On the state of the record before us, however, we need not remand.

When property with a readily ascertainable value is exchanged

---

[5]The *Federated* court stated that § 118(a) applies "where contributors anticipate only the indirect benefit of increased business." *Id.* at 519. Although this statement appears to support the Tax Court's theory, it is taken out of context. In the context of a single-part payment, this is the correct standard. It does not purport to inform our treatment of a multi-part payment.

for property without one, the latter property is presumed to be equal in value to the former. *See United States v. Davis,* 370 U.S. 65, 72, 82 S.Ct. 1190, 1194, 8 L.Ed.2d 335 (1962). This principle of tax law has been reaffirmed many times.[6] It reflects the common sense notion that an asset's value is the price persons are willing to pay for it.

G.M. surrendered $600,000 of debt to the Mexican government in exchange for a unknown amount of restricted pesos, each worth an unknown amount. This was an arms-length transaction with real economic substance. Absent a readily-ascertainable value for the amount and worth of the pesos exchanged for that debt extinguishment, we must follow *Davis* and assume that value received for $600,000 of debt is, in fact, $600,000.

B.

We have examined the record carefully. The Commissioner presented considerable evidence about the value of the full 1.7

---

[6]*See, e.g., Keener v. Exxon Co., USA,* 32 F.3d 127, 132 (4th Cir.1994) ("An actual price, agreed to by a willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good."); *Dessauer v. Commissioner,* 449 F.2d 562, 566 (8th Cir.1971); *Bar L Ranch, Inc. v. Phinney,* 426 F.2d 995, 1001 (5th Cir.1970); *Pulliam v. Commissioner,* 329 F.2d 97, 99 (10th Cir.1964); *see also United States v. Garber,* 607 F.2d 92, 97 (5th Cir.1979) (en banc) (assuming, without deciding, the applicability of *Davis* ); *cf. United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973) ("The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves...."); *McDonald v. Commissioner,* 764 F.2d 322, 329 (5th Cir.1985) ("We express initially a strong disinclination to disturb the established meaning of the term "fair market value' as it was enunciated by the Supreme Court in *United States v. Cartwright* ...."). *But cf. Mitchell v. Commissioner,* 590 F.2d 312, 314 (9th Cir.1979) (cautioning that the *Davis* rule should be applied only as a last resort).

billion restricted pesos.[7]  Such evidence is irrelevant in light of our determination that a portion of those restricted pesos constitutes a nontaxable contribution to capital.  The Commissioner presented no evidence whatsoever regarding what portion of the restricted pesos was in exchange for debt extinguishment.  As the Commissioner stated in a brief before the Tax Court, "there is no evidence in the record as to the proper allocation between these segments."

On the basis of this record, we conclude that the portion of

---

[7]The Tax Court found that a restricted peso is equal in value to an unrestricted peso.  In so finding, it decided that an arms-length purchaser would pay the same amount for a peso he could use as he saw fit as he would pay for a peso in an account controlled by the Mexican government, that could be used only for the construction of a plant in Acuña built with Mexican goods and services, and that would never be in the hands of the purchaser because the Mexican government would pay the Mexican vendors directly.

Although the Commissioner presented considerable evidence about the effect of the restrictions on Procesos's stock, the evidence presented about the effect of the restrictions on the pesos was thin.  The Commissioner demonstrated that the interest paid on the unrestricted pesos was not restricted, but the Commissioner did not explain the significance of this fact.  The Commissioner also alleged, with absolutely no factual support, that the restrictions on the pesos were similar to those usually placed on loans and that G.M. would have built the plant in Acuña (presumably, using only Mexican labor and products) in any event.

Other than that ambivalent information, the Commissioner's expert assumed that the restricted pesos were worth their face value, defending that assumption with this statement:  "It seems to me just obvious on its face that at that cross-section of time, Procesos was in control of pesos whose dollar value was equal to $1,044,000." Considering that it is uncontested that Procesos never controlled the restricted pesos, this is a remarkable statement.  Although we are at a loss to understand how the Tax Court came to the conclusion it did, we need not determine the proper valuation of the restricted pesos, as a large portion of these pesos constitutes a nontaxable contribution to capital.

the restricted pesos given in exchange for debt extinguishment has no readily ascertainable value.[8]  Therefore, following *Davis* and its progeny, we decide that the portion of the restricted pesos granted in exchange for debt extinguishment was worth what was paid for it:  $600,000.

As the Tax Court once stated, "[t]he wearing of judicial robes does not require that we take leave of common sense."[9]  The Commissioner would have us believe—despite a complete lack of record evidence—that the Mexican government was unable to value its own national debt and, therefore, paid substantially more than its fair market value.  The *Davis* rule exists precisely to defeat such self-serving and incredible assertions.

### C.

In summary, G.M. surrendered to the Mexican government a debt worth exactly $600,000, for which it paid $600,000.  As we have found, the property received in exchange for this debt was worth $600,000.  The excess value of that property properly is a

---

[8]We are uncertain which party has the burden of proof on this point.  *See* Leo P. Martinez, *Tax Collection and Populist Rhetoric: Shifting the Burden of Proof in Tax Cases,* 39 HASTINGS L.J. 239, 258 (1988) (noting the confusion in the caselaw).  *Compare* TAX CT. R. 142(a) ("The burden of proof shall be upon the petitioner ....") *with Carson v. United States,* 560 F.2d 693, 696 (5th Cir.1977) ("In a Tax Court deficiency proceeding, once the taxpayer has established that the assessment is erroneous, the burden shifts to the government to prove the correct amount of any taxes owed.").  For purposes of this appeal, we assume *arguendo* that the burden of proof remains with the taxpayer.  Nonetheless, the lack of evidence in the record about the value of the portion of the restricted pesos given in exchange for debt extinguishment is, in and of itself, strong evidence that those pesos had no readily ascertainable value.  G.M. has met its burden.

[9]*Freytag v. Commissioner,* 89 T.C. 849, 878, 1987 WL 45307 (1987), *aff'd,* 904 F.2d 1011 (5th Cir.1990), *aff'd,* 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991).

nontaxable contribution to capital under § 118(a).  Accordingly,

G.M. recognized no gain from the Transaction.[10]

REVERSED and RENDERED.

_____

[10]G.M.'s basis in the property it acquired as a contribution to capital is zero.  *See* 26 U.S.C. § 362(c)(1).  Therefore, G.M. presumably will pay taxes on the contribution when it sells or liquidates the factory.