**KOHLER COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 01–C–753.

United States District Court, E.D. Wisconsin.

Feb. 20, 2003.

Herbert Odell, Troy Olsen, Miller & Chevalier, Bala Cynwyd, PA, Janice A Rhodes, Stephen E. Kravit, Kravit Gass Hovel & Leitner, Milwaukee, WI, Philip Karter, Miller & Chevalier, Bala Cynwyd, PA, for Plaintiff.

Charles P Hurley, Richard R. Ward, Steven D. Silverman, United States Department of Justice (DC), Tax Division, Washington, DC, James L Santelle, United

States Department of Justice (ED–WI), Office of the U.S. Attorney, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

GRIESBACH, District Judge.

In a four-party transaction, plaintiff Kohler Company purchased an interest in U.S. dollar denominated debt obligations of the Mexican government from an unrelated seller, a U.S. bank. Kohler then exchanged its interest in the debt obligations for equity in a newly formed Mexican subsidiary which was funded, upon cancellation of the debt, by a deposit of Mexican pesos in a restricted account for the benefit of the subsidiary by the Mexican government. The dollar value of the pesos deposited in the account exceeded the dollar amount that Kohler had paid for its interest in the debt obligations.

The defendant United States conducted an audit of the transaction. It concluded that Kohler realized a short-term capital gain of $8,386,296, the difference between what Kohler had paid for the Mexican debt obligation and the dollar value of the face amount of restricted pesos made available to its subsidiary, and assessed the tax it claimed was due. Kohler paid the tax assessed under protest and commenced this action. Kohler now seeks a refund, contending alternatively that the value of the restricted peso credits equaled the amount paid for the obligations, that any excess was a non-taxable contribution to capital by Mexico, or that any gain realized is not recognized under the 26 U.S.C. § 367. Because Kohler believes its arguments succeed as a matter of law, it has filed a motion for summary judgment.

The United States contends that Kohler realized a substantial gain equal to the difference between the amount it paid for the interest in the Mexican debt obligations it acquired and the face value of the peso credits made available to its subsidiary, and that the tax assessed on this gain was proper. Alternatively, the United States contends that, in the event I conclude that the fair market value of the restricted account made available to Kohler's subsidiary is less than the dollar value the peso credits granted by Mexico, a factual dispute exists as to what Kohler's actual gain may be, and it should be allowed an opportunity to conduct further discovery on that issue. In either event, the United States contends that Kohler's motion should be denied.

For the reasons set forth below, I find that there are material facts in dispute and thus Kohler is not entitled to judgment as a matter of law. I therefore deny Kohler's motion for summary judgment. And because Kohler's motion for summary judgment is denied, the government's motion for leave to conduct further discovery will be denied as moot.

## I.   UNDISPUTED FACTS

Plaintiff Kohler Company is a United States corporation with its principal place of business in Kohler, Wisconsin. Among its varied businesses, Kohler manufactures plumbing products that are marketed and sold around the world. In 1987, Kohler decided to build a plant, to be owned and operated by its subsidiary, Sanimex[1], in the Monterrey, Nuevo Leon, Mexico, for the manufacturing of vitreous china plumbing products for export. Significantly lower labor costs were the driving force behind locating the plant outside the United States. Further, Kohler wanted to in-

---

1.  Kohler Sanimex, S.A. de C.V. ("Sanimex") is and has been a 99.96%-owned Mexican subsidiary of Kohler. (A 0.04% interest is owned by four individuals for the benefit of Kohler because Mexican law requires a minimum of five shareholders.) Sanimex was incorporated on April 29, 1987, in Mexico.

crease its production capacity for lower cost plumbing products in a location within a geographically efficient proximity to the United States, the intended market for such products.

In the course of arranging for the financing of the construction of its new facility, Kohler became aware of the Mexican debt equity swap program. This program was developed during the 1980's, when Mexico was experiencing an economic crisis due, in large part, to a decline in the value of its oil reserves. Because of the economic crisis, Mexico was having difficulties paying its foreign-currency-denominated debt. The "debt equity swap" program was created to reduce the outstanding balance of the Mexican government's foreign-currency-denominated debt and to encourage foreign investment in Mexico.

Negotiated between the government of Mexico and other Mexican public sector debtors and the many foreign lending banks holding imperiled debt obligations, the debt equity swap program was established by the Mexican government pursuant to section 5.11 of the Agreement on the Restructure of the Foreign Public Debt (the "Restructure Agreement") dated August 29, 1985. For the foreign lending banks holding Mexican debt, the debt equity swap program, coupled with the liberalization of Mexico's foreign investment laws, helped generate a market among United States companies and others for the acquisition of such debt.

Under the debt equity swap program, non-Mexican corporations were allowed to create and/or fund subsidiary operations in Mexico using pesos supplied by the Mexican government if the non-Mexican corporation agreed to purchase an interest in a discounted debt obligation from one of Mexico's creditor banks. The debt equity swap program was designed to ensure that the debt would be canceled without requir-

ing Mexico to use foreign currency, that payments made in exchange for the debt cancellation would remain in Mexico, and that foreign currency would enter the country through the export of goods manufactured by the Mexican subsidiary of the non-Mexican corporation, thus improving Mexico's account of foreign currency reserves.

The program required participating corporations to dedicate production for foreign markets and to construct their facilities using only Mexican labor and materials. The Mexican government considered the debt equity swap program to have positive effects on employment and on Mexico's balance of payments. In determining how much it would pay for the debt obligations under the debt equity swap program, Mexico employed a sliding scale. Those projects that met certain characteristics were favored over projects that did not. The most favored projects employed new technology and had one or more of the following characteristics: new production intended for export; purchase of a Mexican company with 100 percent foreign capital; and production preventing outflow of foreign exchange or generating foreign exchange. The least-favored projects under the debt equity swap generated no foreign exchange.

Under the Restructure Agreement between Mexico and its creditors, any bank that obtained a proportionately greater payment on Mexican obligations than other banks was required to share the excess ratably with all other banks by purchasing interests in Mexican debt from the other banks. Swap transactions were specifically excluded from this requirement.

Kohler recognized the debt equity swap program as an opportunity to realize even greater savings on its planned investment in Mexico. After deciding to apply for participation in the debt equity swap pro-

gram, Kohler approached several banks to explore the market for the acquisition of interests in Mexican debt. At the time Kohler was considering participation in the debt equity swap program, the Mexican debt interests being offered by the various banks were at approximately fifty cents on the dollar. The discount in the face value of the Mexican debt obligations offered by the banks reflected the fair market value of Mexican debt interests at the time.

On May 15, 1987, Kohler applied for approval to participate in the debt equity swap program established by the Mexican government pursuant to section 5.11 of the Restructure Agreement. Kohler's application was made pursuant to the provisions of the Operating Manual for the Capitalization of Liabilities and the Replacement of Public Debt with Investment (the "Operating Manual"). The Operating Manual was published jointly by the Ministry of Finance and Public Credit and the National Commission on Foreign Investment, both agencies of the Mexican government. The Operating Manual set forth general and specific procedures for section 5.11 transactions during the period at issue.

By letter dated September 4, 1987, the National Commission on Foreign Investment, on behalf of the Mexican government, approved Kohler's application. By letter dated September 14, 1987, the Ministry of Finance and Public Credit approved Kohler's application.

On October 16, October 23, and December 28, 1987, Kohler purchased from Bankers Trust Company an interest in debt obligations of the Mexican government, which obligations were traded on the public market. The principal balance of the debt interest so acquired was $22,439,000 in United States dollars. Kohler acquired these debt obligations for $11,114,267 in United States dollars. Kohler's transaction with Bankers Trust to acquire these debt obligations was an arms-length trans-

action between unrelated parties, and the price paid was the fair market value of these debt obligations at the time. For Bankers Trust, the amount it received represented the best price at which these debt obligations could be sold.

On December 23, 1987, Kohler and Bankers Trust entered into an Assignment Agreement, which set forth the terms of the assignment by Bankers Trust to Kohler of the interest in these debt obligations for the sum of $11,114,267 in United States dollars. Meanwhile, on December 15, 1987, Kohler, Sanimex, Bankers Trust, and the Mexican government entered into a Conversion Agreement setting forth the manner in which the debt equity swap transaction was to be consummated.

Despite Kohler's desire to construct and operate a manufacturing facility in Mexico and to take advantage of the debt equity swap program to partially fund the undertaking, Kohler was greatly concerned about the economic instability of Mexico at that time and the effect that such instability might have on both Kohler's overall investment in general and its participation in the debt equity swap transaction in particular.

Kohler's fears that the Mexican government might not live up to its agreements caused a reevaluation of its decision to proceed with the debt equity swap transaction. Between applying for the debt equity swap program and the closing of the transaction, Kohler considered what its options would be in the event it backed out. Kohler investigated the option of attempting to resell the debt obligations acquired from Bankers Trust, concluding that should Kohler attempt to sell the debt obligations rather than proceed with the debt equity swap transaction, Kohler would have been fortunate to dispose of the debt interest for what it paid. Despite Kohler's reservations about continuing

with the transaction, even after it had already acquired an interest in the debt obligations from Bankers Trust, Kohler ultimately decided to proceed.

The debt equity swap transaction closed on December 28, 1987. Pursuant to the terms of the Conversion Agreement, a series of prearranged interrelated steps occurred. First, in exchange for $11,114,267 in United States dollars, Bankers Trust transferred the interest in the debt obligations to Kohler. (Acquisition of the debt obligations actually occurred in stages prior to as well as on the actual date of the closing.) Second, Bankers Trust delivered the original debt obligations to the Mexican Ministry of Finance and Public Credit for cancellation. Third, the Mexican Central Bank established a bank account, the use of which was restricted, for the benefit of Sanimex. The Mexican Central Bank then deposited into that account 43,778,-766,018 Mexican pesos, nominally equivalent to $19,500,564 in United States dollars, which is 87% of the face value of the original debt obligations. Fourth and finally, Sanimex issued qualified capital stock in the name of Kohler, for the nominal amount of the pesos deposited in the account.

The pesos account created by the Mexican government was protected from exchange rate losses. To protect the value of the pesos account from devaluation against the United States dollar, interest earned on the pesos account accrued at a rate that was adjusted monthly to reflect the fluctuation in exchange rates. One of two currency exchange rates (either the free rate or a mix between the free rate and a controlled rate) was applied at the discretion of the Mexican government. Although this arrangement, memorialized in the Conversion Agreement, was unilaterally imposed by the Mexican government after the originally negotiated agreement was to have applied the free rate of exchange, at the time of the agreement the spread between the free and controlled rates had closed to a negligible amount.

Under the terms of the transaction, restrictions were placed on the use of the pesos deposited into Sanimex's account. The pesos could be used only for the purchase of land and equipment and the construction of an industrial plant in Mexico. Sanimex could purchase land only from persons willing to reinvest the sale proceeds in Mexico; i.e., the sellers had to invest the sale proceeds in Mexico. In addition, the Mexican government controlled the pesos and paid them to vendors directly. Sanimex's ability to select its vendors was also restricted; Sanimex had to employ Mexican companies and use Mexican goods and services in constructing the plant. Equipment purchases with the pesos could be made only from preapproved Mexican vendors. Moreover, the pesos were actually controlled by the Mexican government and were paid to preapproved vendors directly. The use of interest on the account, however, was not restricted by the parties' agreement.

Kohler's stock in Sanimex was also subject to restrictions. Under section 5.11 of the Restructure Agreement, Kohler could not transfer the stock to a Mexican entity or person until January 1, 1998. The stock could not be redeemed on a basis more favorable than the amortization of the surrendered debt obligation. With a minor exception, the stock could not pay guaranteed dividends, irrespective of earnings and profits. And finally, the stock could not be converted into stock that did not contain these restrictions.

Kohler and Sanimex understood that the building of the plant would not result in the departure of foreign exchange out of Mexico. Furthermore, in order to protect Mexico's foreign currency position, additional requirements were imposed on Sani-

mex's use of the funds to build the plant. The plant had to be constructed by construction companies and subcontractors whose social capital was subscribed exclusively by Mexican investors. Also, Sanimex was required to dedicate production for the foreign market.

To participate in the debt equity swap program, Kohler paid the Mexican government a filing fee of $50,000 and entered into an agreement with Bankers Trust that called for installment payments of a fee of $100,000.

On or about September 15, 1988, Kohler timely filed a federal corporate income tax return for the 1987 calendar year with the Internal Revenue Service. The total tax purported as due on the return was $29,081,064, which was paid in several installments between April 15, 1987, and September 15, 1988.

Upon an audit, the IRS adjusted Kohler's 1987 income by $8,386,296, which was the difference between the U.S. dollar equivalent of the face amount of restricted pesos ($19,500,564) and the amount Kohler paid for the Mexican debt obligations ($11,114,268). The United States asserted in the audit examination that the difference represented short-term capital gain for the 1987 taxable year. In addition to the debt equity swap adjustment, the IRS made other adjustments that are not the subject of this litigation.

The sum of all adjustments resulted in corrected federal income tax liability of $35,486,712 for the 1987 taxable year, and the IRS asserted a deficiency of $6,405,648. Kohler paid under protest the $6,405,648 balance of the corrected tax liability, along with deficiency interest, in three installments between December 22, 1994, and June 12, 1996. Kohler paid the full amount of all asserted deficiencies in federal income taxes and interest for the 1987 taxable year.

On or about May 8, 1998, Kohler timely filed with the IRS an amended tax return in which it claimed a refund of income taxes for the 1987 taxable year in the amount of $3,350,383, which represents the additional tax assessed against Kohler as a result of the $8,386,296 debt equity swap adjustment by the IRS, plus interest. Kohler claimed it realized no taxable gain as a result of the debt equity swap transaction.

The IRS disallowed the refund claim on May 2, 2000. Kohler brought this action for refund on July 27, 2001, seeking recovery of the $3,350,383 plus interest, pursuant to 26 U.S.C. § 6532(a)(1). It now moves for summary judgment.

I have jurisdiction over the case pursuant to 28 U.S.C. § 1346(a)(1). The parties agree that venue is proper under 28 U.S.C. § 1402(a)(2).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323, 106 S.Ct. 2548. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial. *Id.* at 322–24, 106 S.Ct. 2548.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact to survive summary judgment. *Id.* at 247–48, 106 S.Ct. 2505.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago,* 119 F.3d 1286, 1291 (7th Cir.1997). A material issue of fact is "genuine" where the opposing party presents specific and sufficient evidence that, if believed by a jury, would actually support a verdict in its favor. Fed.R.Civ.P. 56(e);*Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In this case, Kohler has not disputed that it, as the plaintiff, bears the burden of proving by a preponderance of the evidence that the tax assessment is incorrect and of proving the correct amount, if any, of its tax overpayment. *See Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935). A plaintiff moving for summary judgment bears a great initial burden because it bears the burden in the case. Whereas a defendant may obtain summary judgment by establishing that a plaintiff cannot win on any one element of its case, a plaintiff must show that the evidence supporting all elements of its claims is so compelling that no reasonable jury could return a verdict for the defendant. *See Select Creations, Inc. v. Paliafito Am., Inc.,* 911 F.Supp. 1130, 1149 (E.D.Wis.1995); *cf. Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

## III. DISCUSSION

The gross income of a taxpayer for federal income tax purposes includes "all income from whatever source derived." 26 U.S.C. § 61(a) (1982)[2]. Generally, the entire amount of a gain on the sale or exchange of property must be recognized for tax purposes. 26 U.S.C. § 1001(c). A gain from the sale or other disposition of property is "the excess of the amount realized therefrom over the adjusted basis." 26 U.S.C. § 1001(a). The "amount realized" from the sale or other disposition of property means "the sum of any money received plus the fair market value of the property (other than money) received." 26 U.S.C. § 1001(b).

■ Foreign currency is considered property, not money. *Nat'l–Standard Co. v. Comm'r,* 749 F.2d 369, 371 n. 3, 372 (6th Cir.1984); *Fed. Nat'l Mortgage Ass'n v. Comm'r,* 100 T.C. 541, 582, 1993 WL 210390 (1993); *Norwest Corp. v. Comm'r,* 108 T.C. 265, 301, 1997 WL 203700 (1997). Debt instruments are similarly considered property. *See Cottage Sav. Ass'n v. Comm'r,* 499 U.S. 554, 559, 111 S.Ct. 1503, 113 L.Ed.2d 589 (1991); *Norwest Corp.,* 108 T.C. at 301; *see also* 26 U.S.C. § 1271(a)(1). The exchange of property such as debt or foreign currency for other property is a taxable disposition of property. *See* § 1001(b); *see also Norwest Corp.,* 108 T.C. at 301.

Based upon these principles, the government contends that Kohler clearly realized a taxable gain as a result of the transaction. In return for the Mexican debt obligations for which Kohler paid approxi-

---

**2.** All cites to Title 26 of the United States Code, i.e., the Internal Revenue Code, are to the version in effect in 1987, which was the 1982 edition of the Code plus its supplements if applicable. I will simply cite to the code sections from this point on, without including the year of the edition.

mately $11 million, Mexico paid into an account for the benefit of Sanimex, Kohler's subsidiary, a sum of pesos having a nominal value of approximately $19.5 million. Sanimex then issued stock in Kohler's name for the nominal amount of the pesos deposited in the account. Thus, the government concludes, Kohler realized a gain of $8.5 million, the difference between the what it gave in the exchange, $11 million, and what it received, stock reflecting the $19.5 million in pesos deposited in the Sanimex account.

Kohler not only disputes the size of the gain the government claims it realized, but contends that the undisputed facts clearly establish that it did not realize any taxable gain. Its motion for summary judgment is based on essentially three arguments. First, it contends that it realized no gain whatsoever from the debt equity swap transactions, as the value of property it exchanged equaled the value of the property it received. Second, Kohler asserts in the alternative that if it realized a gain, such gain is wholly attributable to the Mexican government's contribution to the capital of Kohler or its subsidiary, Sanimex. And third, again in the alternative, Kohler asserts that if it realized a gain, such a gain is not taxable under the terms of a treasury regulation limiting the recognized gain to the amount Kohler could have received for the debt obligation if it sold it on the open market. I will address each in turn.

### A. Did Kohler Realize a Gain?

Kohler first argues that as a matter of law and under the presumption of equal exchanges recognized in *United States v. Davis*, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962), it realized no gain as a result of the "debt equity swap" transaction. Under *Davis*, where property with a readily ascertainable value is exchanged in an "arm's length" transaction for property without a readily ascertainable value, the

value of the latter property is presumed to be equal to that of the former. 370 U.S. at 68, 82 S.Ct. 1190. Treating its purchase of the Mexican debt obligations, the cancellation of the debt in exchange for the restricted peso account for the benefit of its subsidiary, and the issuance of the subsidiary's stock to it as a single transaction, Kohler argues that, since the value of the restricted peso account is not readily ascertainable, it must be presumed equal to the $11 million it paid for the debt obligation. It therefore follows, according to Kohler, that the value of what it received is equal to what it paid, and thus no gain was realized in the transaction. Thus, it argues, the United States erred in assessing a tax on the transaction.

In support of its argument, Kohler relies primarily upon *CMI International, Inc. v. Commissioner*, 113 T.C. 1, 1999 WL 492535 (1999) and *G.M. Trading Corp. v. Commissioner*, 121 F.3d 977 (5th Cir. 1997), both of which addressed the tax consequences of similar, if not identical, transactions to two other U.S. corporations that had participated in the Mexican debt equity swap program. In each of those cases, Kohler contends, the courts found that the taxpayer had realized no gain. Kohler contends that the same result should obtain here.

Neither *CMI* nor *G.M. Trading*, however, held that the value of the pesos paid by the government of Mexico was equal to what the taxpayers had paid for the Mexican debt obligations as a matter of law. In *CMI*, the United States Tax Court held that the amount of gain, if any, would not be recognized because, under Temp. Treas. Reg. § 1.367(a)–1T(b)(3)(i), such gain would be limited to zero. 113 T.C. at 5–6, 1999 WL 492535. (This is Kohler's third argument in this case and will be addressed below.) And in *G.M. Trading*, the Fifth Circuit held that the dollar value

of the pesos paid by the government of Mexico that was in excess of what the taxpayer paid for the debt obligations was a nontaxable contribution to capital under 26 U.S.C. § 118(a), and thus would not be taxable in any event. 121 F.3d at 8. (This is Kohler's second argument and will also be addressed below.) But in neither case did the court hold, as Kohler argues here, that the amount paid by the taxpayer for the Mexican debt obligations was equal to the value of the restricted peso account as a matter of law. In fact, both cases implicitly assume just the opposite—that the restricted peso account had a greater value. Otherwise, it would have been unnecessary for the *CMI* court to determine that the gain realized was not recognized for tax purposes, and for the *G.M. Trading* court to conclude that the excess value received constituted a contribution to capital.

The major flaw in Kohler's argument that it realized no gain as a result of the debt equity swap is that it ignores the fact that, though they were inter-related, there were actually two separate transactions involved. The first was Kohler's purchase of the debt obligation for $11 million from Bankers Trust. Notwithstanding Kohler's contention to the contrary, this was a completed transaction; consideration went both ways. Kohler in fact implicitly admits that the purchase of the debt obligation was separate from the remainder of the debt equity swap transaction: it admits that it acquired the debt interest before the rest of the steps in the swap transaction took place, it admits that it transferred the debt interest (not U.S. dollars) to Mexico, and it admits that it investigated backing out of the remainder of the transaction and selling the debt obligation on the open market. As a result, while the debt obligation may have had an unascertained value in the Kohler/Bankers Trust transaction and thus be valued at $11 million, that presumed valuation holds true only for the Kohler/Bankers Trust part of the swap transaction, not the Kohler/Mexico/Sanimex part of the swap transaction.

After acquiring the debt obligation in the first transaction, Kohler then exchanged the *debt obligation*, valued at $11 million, in a three way transaction, to Mexico for the peso account in the name of Sanimex, which then issued stock to Kohler. It is the government's contention that the consideration given by the Mexican government in exchange for Kohler's interest in the debt obligation was greater than the $11 million Kohler paid for it—or at least that it should be allowed a chance to establish as much. And in support of this contention, it points to the undisputed fact that the nominal value of the peso account was $19.5 million. Because $19.5 million is greater than $11 million, the government reasonably argues that Kohler realized a gain from the transaction.

Contrary to the suggestion of the court in *G.M. Trading*, it is not patently incredible · to suggest that the government of Mexico was willing to enter into a transaction in which it agreed to pay Kohler more to extinguish its debt obligations than they were worth on the open market. The plain fact is that it was worth more to Mexico to extinguish its U.S. debt with pesos under a debt equity swap arrangement than by paying it off in foreign currency. In this respect, Mexico was no different than any buyer who has a greater desire or need for a particular item of property than the average person who would only pay fair market value.

Exchanges do not always occur at fair market value. Fair market value is achieved through an impersonal and mechanistic process, the net result and amalgam of offers and acceptances, or at least one offer and one acceptance at arm's length. Occasionally, though, the process sheds its dispassionate qualities and becomes personal. In these situations, a

personal need, which is not shared by other market participants, inserts itself into process and thwarts the default assumption that the market price was paid and received. Thus an avid collector will often be willing to exceed the market price to obtain a rare specimen he especially desires. A playoff-bound team whose star pitcher sustains an injury will be willing to beat the fair market price and nab the best available free agent to fill that spot. In the corporate world, a strategic buyer is generally willing to pay more than a financial buyer, and a would-be monopolist would pay more than most for control of a competitor.[3] Likewise, a traveler who has run out of gas in the desert would gladly pay a premium over the market price for a gallon or two of gasoline. It is not unreasonable, therefore, to conclude that Mexico, whose economy had also run of gas, might be willing to exceed the fair market price in this case. Inherent in a free market economy is the freedom to pay *more* than the market otherwise necessitates.

In this case, the undisputed facts suggest that by purchasing Mexico's U.S. debt obligations, Kohler was providing a valuable service to Mexico which would have cost Mexico far more to perform on its own. While an open market for Mexican debt obligations purchased with dollars existed, there was no such open market for Mexican debt obligations purchased with restricted pesos. Here, it is possible if not likely, that Mexico was willing to pay more than the market price for the debt obligation because it was getting more. Mexico perhaps could have purchased the debt obligation for $11 million, but it would have had to do so in U.S. dollars, which it did not want to do, and the money would

have left Mexico. More importantly, Mexico may not have been able to buy the debt obligation for $11 million at all. If Kohler purchased the debt obligation for a swap, Bankers Trust did not have to purchase Mexican debt from other banks. But if Mexico repurchased its own debt, Bankers Trust had to purchase Mexican debt from other banks. It is conceivable that the cost of repurchasing the debt obligation would have been higher to Mexico than Kohler. And, of course, the face amount of the debt Mexico was able to extinguish in the transaction was actually $22 million, so Mexico was in reality getting a deal by paying the debt off for $19.5 million.

■ Kohler argues, however, that the $19.5 million in pesos that the Mexican government paid are in fact worth far less than their dollar value because of the stringent restrictions that were attached to the account. That is very likely true. As Kohler points out, the government's own rulings acknowledge that restrictions placed on the use of local currency "will generally reduce their fair market value" below the value of the local currency at the free market exchange rate. Revenue Ruling 87–124, 1987 C.B. 205. The cases Kohler cites also support this principle. *See Shackleford v. United States,* 262 F.3d 1028 (9th Cir.2001), *Bayley v. Commissioner,* 624 F.2d 884 (9th Cir.1980), and *Landau v. Commissioner,* 7 T.C. 12, 1946 WL 5 (1946). But it does not necessarily follow that the restrictions placed on the peso account reduce its value by the entire $8.5 million dollars that represents the difference between what Kohler paid for the debt and what Mexico paid for its cancellation. At the very least, the government

---

**3.** This principle is made manifest in the game of Monopoly, where one's dominance of railroads or properties substantially increases one's expected returns. Thus, a player owning three of the four railroads would undoubtedly pay more than the $150 list price for the fourth.

should be given an opportunity to show that it does not.

Kohler argues further, however, that because the value of the restricted peso account is not readily ascertainable, it must be presumed to be equal to what it paid for the debt obligations under *Davis*, 370 U.S. 65, 82 S.Ct. 1190. In support of this contention, Kohler cites not only *Davis* and *Philadelphia Park Amusement Co. v. United States*, 130 Ct.Cl. 166, 126 F.Supp. 184 (1954), but also *Southern Natural Gas Company v. United States*, 188 Ct.Cl. 302, 412 F.2d 1222 (1969). *Southern Natural Gas* is particularly notable, Kohler argues, because in that case the court expressly addressed the question of whether it was appropriate to utilize expert testimony to determine the value of stock in cases where the presumed equivalence-in-value rule was being used. (Plaintiff's Reply Brief, at 8). In *Southern Natural Gas*, the court held that it was not, noting:

> ... since the use of such expert opinion testimony to establish valuation ... is proper only when there is no better method of arriving at a reasonably accurate figure, it is plain that the use of the barter-exchange rule was necessarily considered in such cases as constituting a better method. It is simply a matter of what is the best evidence in a particular case.

412 F.2d at 1255. Because there is no readily ascertainable value for either the peso credits deposited for the benefit of Sanimex, or for the Sanimex stock it received, Kohler contends that the value of each must be presumed to equal what it paid for the debt interest purchased from Bankers Trust, $11 million.

But while it may be true that the value of the stock is not readily ascertainable, the same is not necessarily true of the restricted peso account. It is undisputed that there does exist an established market for Mexican pesos. While the restrictions placed upon the use of the pesos in this case may warrant a discount in their value, as noted above, nothing in the record before me supports the suggestion, implicit in Kohler's argument that the exchange is presumed equal, that the discount will be of such magnitude that $8.5 million worth of pesos will be reduced to zero. A discount of such a magnitude is especially unlikely if, as the government argues, the restrictions placed on the pesos had no practical impact on how Kohler intended to use them. I also note that the declaration filed by the government in support of its motion to extend time to allow discovery specifically states that the value of the restricted account can be determined using "standard economic analyses." (Declaration of Michael I. Craig, ¶ 9.) And since the value of the stock is intended to reflect the value of the peso account, if the value of the restricted account exceeds what Kohler paid for the debt obligations, the value of the stock presumably will too.

Based upon the foregoing, I conclude that at least at this point, there exists a factual dispute as to whether the value of the restricted peso account is readily ascertainable. It may be true, as Kohler argues, that it is not and that, therefore, the presumed equivalence rule applies. But I am unable to say so as a matter of law on the record before me. I therefore turn to Kohler's second argument—that any excess value it received in exchange for the debt obligations constitutes a nontaxable contribution to capital by Mexico.

**B. Does The Excess Value, If Any, Received By Kohler Constitute A Nontaxable Contribution To Capital?**

Under 26 U.S.C. § 118(a), a taxpayer corporation's income "does not include any contribution to the capital of the taxpayer." The exclusion is not limited to contributions by shareholders. Treas. Reg.

§ 1.118–1.[4] It applies as well to the value of any "property contributed to a corporation by a governmental unit ... for the purpose of inducing the corporation to locate its business in a particular community, or for the purpose of enabling the corporation to expand its operating facilities." *Id.* The exclusion applies to contributions by foreign governments as well. *See Edwards v. Cuba R.R. Co.,* 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124 (1925). The exclusion does not apply, however, to any property transferred "in consideration for goods or services rendered." Treas. Reg. § 1.118–1; *see also G.M. Trading,* 121 F.3d at 980–81. Property contributed to a corporation by a foreign government has a basis of zero for tax purposes. 26 U.S.C. § 362(c).

■ Kohler contends that if it received more in the debt equity swap transaction than it paid for the Mexican debt obligations, such excess is wholly attributable or equal to the Mexican government's contributions to Sanimex's capital and thus is exempt under 26 U.S.C. § 118(a). Again, Kohler relies on *G.M. Trading Corp. v. Commissioner,* which, as noted above, held with respect to an essentially identical debt equity swap transaction that the value received by the taxpayer in excess of what it paid constituted a nontaxable contribution to capital under § 118(a).

But *G.M. Trading* was not decided on summary judgment. It was on the basis of a full factual record that the Fifth Circuit rendered its decision. Also of note, the Fifth Circuit in *G.M. Trading* specifically acknowledged that a payment made by the Mexican government in exchange for extinguishing a portion of Mexico's debt "was compensation for a specific, quantifiable service and does not qualify as a nontaxable contribution to capital." 121 F.3d at 981. Because the court also con-cluded that a portion of the payment by Mexico was intended to induce G.M. to invest in the Mexican economy and thus did qualify as a contribution to capital, it looked for some basis in the record to bifurcate the payment "into its constituent parts and tax G.M. on the value of the restricted pesos received in exchange for extinguishing the debt and exclude the balance from taxation." *Id.* But because the record failed to disclose any basis for determining the portion of Mexico's payment that was intended as payment for cancellation of its foreign debt, and because the value of the restricted pesos exchanged for the debt extinguishment was not readily ascertainable, the court, applying *Davis,* assumed that the amount Mexico paid for debt extinguishment was equal to what G.M. had paid for the debt and that the balance constituted a nontaxable contribution to capital. 121 F.3d at 983–84. Kohler asks that I do the same here.

In response, the government claims that *G.M. Trading* is simply wrong on this issue. None of the amount received in exchange for the Mexican debt by G.M. in that case, or Kohler in this case, it contends, qualifies as a contribution to capital. In support of its argument, the government notes that exclusions from gross income, such as § 118, are to be narrowly construed. *Commissioner v. Schleier,* 515 U.S. 323, 328, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995). It argues that whether property transferred to a corporation constitutes a contribution to capital depends upon the dominant purpose of the transferor. Where as here, it contends, the dominant purpose of the payment is to extinguish the transferor's own debt, no contribution to capital should be found.

But even if a portion of the pesos are to be considered a contribution to capital, the

**4.** All citations are to the regulations in effect in 1987.

government argues that Kohler would nevertheless have realized a taxable gain under § 367 from its transfer of the pesos to Sanimex. Under § 367, a gain is recognized when appreciated property is transferred to a foreign corporation. The government argues that because Kohler had a zero basis in the portion of pesos considered a contribution to capital, and because the fair market value of those pesos was greater than zero, Kohler is subject to tax on the gain realized on the transfer of the pesos to Sanimex.

Finally, the government contends that even if I conclude that a portion of what Kohler received from Mexico constitutes a contribution to capital and reject its argument that such portion would nevertheless be taxable to Kohler upon its transfer to Sanimex, summary judgment should still be denied because a factual dispute exists as to the proper allocation of Mexico's payment between debt extinguishment and capital contribution. Noting that the Fifth Circuit in *G.M. Trading* based its decision upon the failure of the commissioner to present evidence as to how the payment should be allocated, the government contends that given the procedural posture of this case, that burden is on Kohler. And because Kohler has failed to present evidence as to the proper allocation, its motion for summary judgment should be denied.

On this issue, I agree with the government that any excess in the value of the pesos over what Kohler paid for the Mexican debt does not constitute a contribution to capital. Mexico paid the equivalent of $19.5 million in pesos to extinguish $22 million in debt. While the debt may have been valued at only half its face value by the banks that held it, it represented for Mexico a legal obligation to pay $22 million in U.S. currency. Mexico's payment of $19.5 million in pesos to extinguish this debt resulted in a direct benefit to the

government of Mexico and constitutes consideration for that benefit.

Moreover, to be considered a nonshareholder contribution to capital by a government entity, the payment would have to be "for the purpose of inducing the corporation to locate its business in a particular community, or for the purpose of enabling the corporation to expand its operating facilities." 26 CFR § 1.118–1. But in this case it is undisputed that Kohler had decided to locate its plant in Mexico before it even considered participating in Mexico's debt equity swap program. Thus, it cannot be said that the purpose of the payment was to induce Kohler to locate its business there.

I also question whether the Fifth Circuit's holding in *G.M. Trading* that Mexico's payment must be bifurcated into two portions, one that was in exchange for debt extinguishment and the other that was to induce the taxpayer to invest in the Mexican economy, makes economic sense. In other cases where such bifurcation had been ordered, the portions that were held to qualify as contributions to capital were specific and ascertainable dollar amounts that were specifically earmarked for such a purpose. *See, e.g., Concord Village, Inc. v. Commissioner,* 65 T.C. 142, 155, 1975 WL 3188 (1975) (amounts accumulated in special replacement reserve account were "earmarked solely for capital expenditures"). Here, by contrast, the entire amount paid by Mexico in exchange for the extinguishment of its debt was to be used to construct and operate the new facility. There is no basis upon which such a bifurcation could be made.

I therefore conclude that any excess Kohler received does not constitute a nontaxable contribution to equity, and I will proceed to consider Kohler's third argument, that any gain it realized in the trans-

action is not recognized for federal income tax purposes.

### C. Is Kohler's Gain From The Transaction, If Any, Recognized?

██ Kohler next argues that any gain it may have realized from the transaction is not recognized for federal tax purposes. Section 1001(c), as noted above, provides that taxpayers generally recognize gain realized on the sale or exchange of property. No gain is recognized, however, if property is transferred to a wholly owned subsidiary by a shareholder in exchange for stock. 26 U.S.C. § 351(a). Although this rule of non-recognition does not apply if the transfer is from a domestic U.S. parent to a foreign subsidiary, 26 U.S.C. § 367, Kohler argues that under Treas. Reg. § 1.367(a)–1T(b)(3)(i), any gain recognized would be limited to zero. Thus, it argues, no tax is due.

In support of this argument, Kohler relies upon *CMI International, Inc. v. Commissioner*. *CMI*, as noted above, involved a similar, if not identical, transaction. As in this case, the taxpayer corporation argued that it had realized no gain in the transaction because the fair market value of the stock it received equaled its basis in the debt interest it transferred. In the alternative, the taxpayer argued that if it did realize gain, the amount recognized was limited to zero under § 1.367(a)–1T(b)(3)(i), Temporary Income Tax Regs., 51 Fed.Reg. 17939 (May 16, 1986), because the debt ˆinterest was not appreciated property. 113 T.C. at 5, 1999 WL 492535.

The Tax Court agreed with the taxpayer's argument that no gain would be recognized in the transaction. In describing the transaction before it, the court noted that the taxpayer had transferred the Mexican debt interest it acquired to its Mexican subsidiary. With respect to such transfers, Treas. Reg. § 1.367(a)–1T(b)(3)(i) provides:

If a U.S. person transfers property to a foreign corporation in a transaction on which gain is required to be recognized under section 367(a) and regulations thereunder, then the gain required to be recognized by the U.S. person shall in no event exceed the gain that would have been recognized on a taxable sale of those items of property if sold individually and without offsetting individual losses against individual gains.

Noting that the legislative history of § 367(a) indicated that its "aim is to prevent the removal of appreciated assets or inventory from the U.S. tax jurisdiction prior to their sale," 113 T.C. at 6, 1999 WL 492535, *quoting* H. Rept. 94–658, at 242 (1975), 1976–3 C.B. (Vol.2) 695, 934, the court in *CMI* held that the regulation operated so as to limit any gain recognized in such a transfer to what it would have been in a normal taxable exchange. In the case before it, the *CMI* court held that the taxpayer had not transferred appreciated property. On the date of the transfer, the basis of the debt interest was what the taxpayer had paid for it. Had the taxpayer exchanged it on the open market, it would have received that amount and no more. Thus, the court held, a sale of the debt interest would have resulted in no gain and so the recognition of any gain on its transfer to a foreign corporation would be limited to zero. Kohler argues that the same result should obtain here.

The difficulty with Kohler's argument, however, is that, unlike the taxpayer in *CMI*, Kohler did not transfer its interest in the debt obligations to its subsidiary. Instead, it transferred its interest in the debt obligations to Mexico, which then deposited the restricted pesos in the Sanimex account. This distinction is significant, the government contends, because Treas. Reg. § 1.367(a)–1T(b)(3)(i) only applies to transfers by a domestic shareholder to a foreign corporation. Since Kohler did not

transfer the debt interests to its subsidiary, the government contends, Treas. Reg. § 1.367(a)–1T(b)(3)(i) simply does not apply.

Kohler argues in response that the transaction in *CMI* was in all material respects identical to what occurred here. In neither case, it points out, did the taxpayers actually transfer the debt obligations or their interests therein to their Mexican subsidiaries. Because of restrictions imposed on the Mexican debt obligations, it notes, only foreign banks could actually hold the obligations. What CMI and Kohler purchased were "interests" in the debt obligations. And then on the closing date of the transactions, each paid the consideration that remained due on the interests, the Mexican government credited the peso accounts for the agreed upon amounts, the subsidiaries issued the stock to the parent corporations, and the banks cancelled the underlying Mexican debt obligations. (Reply Brief, at 13.) The transactions in each case, Kohler contends, were virtually identical and thus the tax consequences should be the same.

But if Kohler's characterization of the *CMI* transaction is correct, and it appears to be so, then the United States Tax Court's characterization is wrong. And if that court's characterization of the transaction in *CMI* is wrong, then it would seem to follow that its analysis of the tax consequences that follow is also flawed. In other words, if in fact the taxpayer corporation in *CMI* did not transfer its debt interest to its Mexican subsidiary, then the court's conclusion that Treas. Reg. § 1.367(a)–1T(b)(3)(i) reduced any gain recognized in the transaction to zero would seem to be in error. If, as in this case, the taxpayer essentially sold the debt interest it acquired to Mexico and received in return shares of stock reflecting the value of the pesos placed in a restricted account for the benefit of its subsidiary, the regulation on which the *CMI* court relied would seem to be inapplicable.

Kohler argues further, however, that under the step transaction doctrine, "the series of integrated steps comprising the debt equity swap transaction should be viewed as part of one complete transaction, and the separate steps of the transaction that are of no economic import should be disregarded." (Reply Brief, at 14.) It suggests that under that doctrine, the fact that it did not transfer the debt interests to Sanimex should be disregarded.

But the step transaction doctrine cannot be stretched that far. In *G.M. Trading,* the taxpayer requested the court to recharacterize the transaction in that case in the same way. The Fifth Circuit rejected the taxpayer's request, stating:

> G.M. urges that we apply the step transaction doctrine and recharacterize the transaction. Specifically, G.M. urges that we treat G.M. as having contributed $600,000 to Procesos and Procesos having purchased the restricted pesos from the Mexican government. We must reject this suggestion.

121 F.3d at 979, n. 2. In so ruling, the Fifth Circuit noted that "[t]he step transaction doctrine allows the disregard of steps that have no substance," but "it does not allow the invention of steps that did not happen." *Id.*

The same reasoning applies here. Kohler, not Sanimex, transferred the debt interests or caused the debt interests to be transferred to Mexico. I cannot ignore this fact. Because the transfer of property was made to the government of Mexico, and not its own subsidiary, Kohler is not entitled to the benefit of Treas. Reg. § 1.367(a)–1T(b)(3)(i). It therefore follows that Kohler's third argument fails as well. Its motion for summary judgment must therefore be denied.

## IV.  CONCLUSION

For the reasons set forth above, IT IS ORDERED that Kohler's motion for summary judgment is denied.

As the summary judgment motion is being denied, IT IS FURTHER ORDERED that the United States's motion for an extension of time under Fed. R.Civ.P. 56(f) is denied as moot.

IT IS ORDERED that a telephonic status conference is set for March 13, 2003, at 9:00 a.m. to discuss further scheduling of this case.